[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
11/20/98
THOMAS  K. KAHN
CLERK

No.  97-6650

_____

D. C. Docket No. CV-94-PT-2476-S

DAVID RAY DUREN,

Petitioner-Appellant,

versus

JOE HOPPER, Commissioner of
Alabama Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(November 20, 1998)**

Before ANDERSON, COX and DUBINA, Circuit Judges.

ANDERSON, Circuit Judge:

## FACTS AND PROCEDURAL HISTORY

David Ray Duren appeals the district court's denial of his petition for writ of habeas corpus, in which he seeks relief from his conviction of capital murder and from his sentence of death. On the evening of October 20, 1983, sixteen year-old Charles Leonard picked up his girlfriend, sixteen year-old Kathleen Bedsole, in his father's Oldsmobile. On their date they were planning to visit some haunted houses in the Birmingham area sponsored by a local radio station. As Leonard drove he noticed a car behind them flashing its headlights. Thinking the car behind them that of a friend, he pulled over into a cul-de-sac and waited. Several minutes later, another car entered the circle, backed out, and then parked. Two men, David Ray Duren and Richard Kinder, emerged and approached the teenagers, still waiting in the Oldsmobile. Duren, carrying a pistol, ordered Leonard and Bedsole out of the car. Duren and Kinder, the latter now wielding a knife, then forced the couple into the trunk.

The two men then drove the Oldsmobile along with their own vehicle to a nearby lot. Abandoning their own car, Duren and Kinder reunited in Mr. Leonard's Oldsmobile. They proceeded to a drive-in restaurant, intending to rob it. Before the robbery transpired, however, Kinder bungled it by prematurely exposing a pistol. The pair then fled the scene of the botched attempt.

After driving some distance, Duren stopped the car in a secluded area in Trussville, Alabama. Duren and Kinder opened the trunk, removed the couple, and tied them together. Kinder seized Kathleen Bedsole's purse and took two twenty-dollar bills from it. The two men then stepped away and huddled, briefly discussing the fate of the couple. They resolved that

Duren would shoot the teenagers to eliminate possible witnesses. Their deliberations finished, Kinder returned to the car; Duren, pistol now in hand, strode toward the bound couple.

Standing approximately seven feet from the tied teenagers, Duren raised his pistol, aimed it, and squeezed the trigger. The gun discharged, striking Kathleen Bedsole in the head. She collapsed,[1] pulling down Leonard with her. Duren lowered the gun and continued firing, striking Leonard in the legs, hips, and chest. Apparently believing both teenagers were dead, Duren walked back to the car and drove away with Kinder.

Shortly after the two men drove away, Charles Leonard, still alive, extricated himself from the rope that bound him. Though riddled with three bullet wounds, Leonard managed to make his way to the home of Mr. and Mrs. Dosier, who promptly notified the Sheriff's Department of the crimes. Kinder and Duren were apprehended shortly thereafter in nearby Huffman, Alabama. Later the same evening, Charles Leonard identified Duren as the man who had shot him and Kathleen Bedsole. Upon subsequent questioning, Duren confessed twice to his participation in the crime. He also led officers to the crime scene and pointed out where he had hidden the murder weapon.

At trial in Jefferson County, Alabama, on March 7, 1984, a jury convicted Duren of capital murder–intentionally killing his victim while engaged in the commission of an armed robbery and/or kidnapping. Later that day, the jury returned a verdict fixing the punishment at death. Before the sentence was actually imposed, however, the judge presiding over the case,

---

[1] Dr. Robert Brissie, the State's forensic pathologist, testified that Bedsole was not immediately killed by the small caliber bullet which penetrated the base of her skull. Instead, in his opinion, she was rendered paralyzed from the neck down, resulting in her asphyxiation.

3

Judge Joseph Jasper, learned that his deceased wife was a fifth cousin of the defendant Duren.

Judge Jasper recused himself, and the case was transferred to Judge James Garrett.

At the sentencing, September 14, 1984, Judge Garrett adopted the trial transcript, yet afforded Duren the opportunity to present any witnesses he desired. In large measure, Duren called the same witnesses as he had at trial, plus two new witnesses. After considering all of the evidence, Judge Garrett concluded that the aggravating circumstances outweighed the mitigating circumstances and therefore imposed a sentence of death.

The Alabama Court of Criminal Appeals upheld the conviction on February 25, 1986. Duren v. State, 507 So. 2d 111, 121 (Ala. Crim. App. 1986). The court remanded the case, however, on the ground that the record was insufficient to conduct an adequate proportionality review of the sentence. On remand, the trial court made further findings and conducted a proportionality review as to the propriety of the death sentence. On return, the Court of Criminal Appeals affirmed the death sentence. Id. at 121.

On April 10, 1987, the Alabama Supreme Court affirmed without comment. Ex parte Duren, 507 So. 2d 121 (Ala. 1987). Duren's petition for writ of certiorari was denied by the United States Supreme Court on October 13, 1987. Duren v. Alabama, 484 U.S. 905, 108 S.Ct. 249, 98 L.Ed.2d 206 (1987). Seeking post-conviction relief, Duren filed a petition pursuant to Temporary Rule 20[2] of the Alabama Rules of Criminal Procedure on February 10, 1988. The Rule 20 court concluded that the majority of defendant's claims were procedurally barred and

---

[2] Rule 20 has since been finalized as Rule 32 of the Alabama Rules of Criminal Procedure.

denied the ineffective assistance of counsel claim on the merits.  Duren v. State, CC-83-0382, slip op. at 1, 4-16 (Cir. Ct. Jefferson Co. July 27, 1989).

The Alabama Court of Criminal Appeals affirmed the judgment of the Rule 20 court, denying the ineffective assistance claim on the merits and finding the others procedurally barred.  Duren v. State, 590 So. 2d 360, 362-63 (Ala. Crim. App. 1990).  The Alabama Supreme Court affirmed and denied rehearing.  Ex parte Duren, 590 So. 2d 369, 375 (Ala. 1991).  The Supreme Court of the United States then denied Duren's petition for writ of certiorari.  Duren v. Alabama, 503 U.S. 974, 112 S.Ct. 1594, 1594-1595, 118 L. Ed. 2d 310 (1992).

Finally, Duren filed a petition in federal court pursuant to 28 U.S.C. § 2254 on October 11, 1994.  The district court denied Duren's petition for writ of habeas corpus and his request for an evidentiary hearing on July 10, 1997.  Duren appeals.

Duren asserts several claims with respect to the guilt and penalty phases of his capital murder trial.  Regarding the guilt phase, Duren contends (A) that he was denied the effective assistance of counsel because he presented an invalid defense.  Regarding the penalty phase, Duren asserts that he was denied the effective assistance of counsel: (B) because he failed to present mitigating evidence of alcohol and drug abuse;
(C) because he failed to object to certain prosecutorial remarks; and (D) because he failed to object to certain jury instructions.  Duren also contends with respect to the penalty phase: (E) that he was denied necessary funds to obtain a mental health expert in violation of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L. Ed. 2d. 53 (1987), and (F) that there was

constitutional error because the judge who actually imposed sentence did not personally hear all of the evidence.[3]  We address each of the foregoing claims in order.

## DISCUSSION

A.  Ineffective Assistance of Counsel at the Guilt Phase for Presenting an Invalid Defense

Duren claims that his trial counsel, Roger Appell, ineffectively assisted him  because Appell presented an invalid defense at trial.  Appell argued that Duren did not intentionally kill Kathleen Bedsole because Duren was aiming for Charles Leonard when he shot and killed Bedsole.  Under the doctrine of transferred intent, however, Duren would have still been guilty of murder whether he intended to kill Bedsole or Leonard.  Therefore, because the defense was without a basis in law, Duren contends that proffering it denied him the effective assistance of counsel.  See Strickland v. Washington, 466 U.S.  668, 104 S.Ct. 2052, 80 L. Ed. 2d 674 (1984)(establishing parameters of ineffective assistance claims).

A claim that a defendant's counsel was so defective as to mandate habeas corpus relief from a conviction has two components.  First, the defendant must show that the counsel's performance was deficient.  Strickland, 466 U.S. at 687, 104 S.Ct. at 2064.  Second, the defendant must demonstrate that the deficient performance prejudiced the defense.  Id.  Both

---

[3] Other claims asserted by Duren on appeal, which are not addressed in this opinion, are rejected without need for discussion.

6

showings are required to make out a claim for ineffective assistance of counsel under the Sixth Amendment. Accordingly, if a defendant cannot satisfy the prejudice prong, the court need not address the performance prong. Id. Because Duren cannot show that he was prejudiced by Appell's presentation of an invalid defense, we need not undertake a performance analysis.

The Strickland court described the test for prejudice as follows: "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068.

Duren cannot satisfy the prejudice prong. The overwhelming evidence presented at trial establishing his guilt far outweighs whatever detriment, if any, Duren may have suffered as a result of his counsel's defense. Duren confessed twice to the killing. He led police officers to the crime scene and even revealed the location of the hidden murder weapon. In addition, Charles Leonard, a victim-eyewitness to the crime, identified Duren as the gunman only a few hours after the shooting. Leonard also provided powerful testimony at trial detailing Duren's murderous actions. Thus, the evidence of Duren's guilt was essentially undisputed at trial. The only factual dispute involved the positioning of Bedsole and Leonard when Duren fired the pistol.

In light of the overpowering evidence of Duren's guilt, therefore, we hold that Duren was not prejudiced by Appell's argument that Duren intended to kill Leonard but not Bedsole.[4]

---

[4] Duren also contends the court's instructions to the jury regarding the doctrine of transferred intent converted the defense's argument--that Duren intended to shoot Leonard rather than Bedsole--into one of sure guilt. It should be noted, however, that the court merely read the

7

Considering the strength of the prosecution's case, no reasonable probability existed that the outcome of the proceeding would have been different had Appell not argued as he did.[5] Consequently, Duren's claim of ineffective assistance at trial fails under the prejudice prong of Strickland.

B. Ineffective Assistance of Counsel at Sentencing for Failure to Present Mitigating Evidence of Alcohol and Drug Abuse

Next Duren claims that he lacked effective assistance of counsel at the penalty phase of his capital murder trial because his attorney failed to present as mitigating evidence Duren's alleged voluntary intoxication on the night of the crime and his alleged history of substance abuse. In order to make good on this claim, Duren must show that Appell's failure to explore substance abuse as a mitigating circumstance constituted a deficient performance and that he was

---

indictment to the jury (charging Duren with the capital murder of Bedsole) and explained generally the doctrine of transferred intent. The court did not specifically highlight the connection between the jury charge and Duren's defense. Moreover, even the prosecution did not inordinately devastate the defense, but instead argued briefly that murder was an intentional killing, whether or not it was the intended victim who perished. At no time was the defense presented by Appell emphasized as one equated with certain guilt.

[5] Because the evidence presented against Duren at trial was overwhelming, all other arguments asserting ineffective assistance of counsel at the guilt phase of the trial are without merit and warrant no discussion.

8

prejudiced as a result. <u>Strickland</u>, 466 U.S. at 687, 104 S.Ct. at 2064. Duren fails on both counts.

From the perspective of experience, Duren's counsel, Roger Appell, was "a reasonably competent attorney" under <u>Strickland</u>. 466 U.S. at 686, 104 S.Ct. at 2064 (<u>citing</u> <u>McMann v. Richardson</u>, 397 U.S. 759, 770-771, 90 S.Ct. 1441, 1448-49, 25 L.Ed.2d 763 (1970)). Appell possessed considerable experience as a criminal defense attorney when he was appointed to represent Duren. Admitted to the bar in 1976, Appell had been practicing for eight years at the time of Duren's trial, with criminal defense constituting approximately half of his practice. He had been involved in numerous felony trials and worked on five capital cases before Duren's murder trial.

After substantial pre-trial investigation of Duren's case, Appell concluded that he would not focus on Duren's substance abuse. Instead, he decided to call David Duren and several of his family members[6] to testify to Duren's "horrible childhood."[7] In so doing, Appell established that Duren's mother abandoned him at an early age, his second stepmother physically abused him, and his third stepmother resented him. As a result, Duren was extremely withdrawn from any meaningful family community as a child, sequestering himself in his room for days at a time.

---

[6] These included: Mary Jo Detlefsen (great aunt); James Duren (grandfather); Shelby Duren (aunt); and Raymond Duren (father).

[7] From Appell's closing Argument at trial: "I believe David had a horrible childhood, not an excuse, not a justification, but he had the kind of childhood that none of us would want our children to have." (R-658).

Appell thus presented Duren as a young man who had been warped by mental and physical abuse suffered as a child. Faced with the unforgiving facts pointing to Duren's guilt, Appell's aim was to help the jury "get an understanding" of David Duren, to expose his inner turmoil, to offer the jury a window on his torment. Appell tendered this testimony "not as a justification," but for the sake of "understanding and mercy."[8]

Appell's choice to emphasize Duren's troubled childhood over his alleged substance abuse was found by the Rule 20 court to be a "strategic decision." Duren v. Alabama, No. CC-83-0382, slip op. at 7 (Cir. Ct. Jefferson Cty. July 27, 1989). According to the Rule 20 court, Appell articulated two sound reasons for not presenting a substance abuse defense: first, he did not believe that Duren's claim of intoxication was credible; and second, he thought such evidence would prejudice the jury.

The Rule 20 court found that Duren's statements that he was intoxicated from alcohol and drugs on the night of the murder were not credible. Considering the complexity of Duren's crime, the clarity of his confession, and the testimony of the officers who observed him that evening, this finding has ample support in the record. The Rule 20 court also found that evidence of Duren's drug abuse would have risked enhancing juror prejudice against Duren, and would have undercut his image as an innocent victim of child abuse. Appell's testimony to this effect and his experience in criminal trials in Jefferson County provide ample support for this finding of fact.

Because the Rule 20 court's finding of fact that a tactical decision was made draws ample support from the record, it becomes a question of law for this court as to whether Appell's

---

[8] Closing Argument of Appell. (R-658).

10

decision not to invoke Duren's substance abuse was reasonable under the circumstances. Cave v. Singletary, 971 F.2d 1513, 1518 (11th Cir. 1992). We readily conclude that Appell's strategy was reasonable on these facts.

The mitigating evidence of voluntary intoxication would have been very weak in light of the strong evidence that Duren was not in fact intoxicated on the night of the murder. We also agree with Appell's reasoning that evidence of Duren's chronic drug use may have been viewed by the jury as inconsistent with the strategy of appealing to the jury for mercy based on Duren's unfortunate childhood. Therefore, under all of the circumstances, we find that Appell's tactical decision was reasonable and not below the wide range of performance set out as acceptable in Strickland v. Washington, 266 U.S. 668, 104 S.Ct. 2052, 80 L. Ed. 2d 674 (1984).

Moreover, Duren cannot demonstrate that he was prejudiced by Appell's failure to present mitigating evidence of Duren's alleged intoxication on the night in question. After canvassing the evidence relating to whether or not Duren might have been impaired by alcohol or drug abuse, the Rule 20 court found that Duren was not in fact intoxicated on the night of the murder. Duren v. State, No. CC-83-0382, slip. op. at 9-10 (Cir. Ct. Jefferson Cty. July 27, 1989). Given this finding of fact, the doctors' testimony at the Rule 20 hearing–that Duren's capacity to control his actions on the night of the murder was substantially impaired because of alcohol and drug consumption--was virtually destroyed.[9]

The doctors' testimony was based largely on Duren's own account of the relevant events. The premise of the doctors' testimony was that Duren was impaired and intoxicated on the night

---

[9] When asked to corroborate their assumption that Duren was indeed intoxicated, both doctors referred the court to what Duren had told them himself, as well as the testimony of Teresa Hardigan, whom the Rule 20 court expressly found to be unreliable.

11

in question as a result of alcohol and drug abuse. When that premise was stripped away by the findings of fact of the Rule 20 court, the doctors' testimony was left with little or no probative value.

Because the doctors' testimony was factually unsound, there is no reasonable probability that the result of the penalty phase would have been different, even if the suggested evidence of alcohol and drug abuse had been explored in great detail. A weak defense is not made strong merely by its presentation to a jury. Given the frailty of Duren's mitigating evidence, we cannot conclude that Duren was prejudiced by his counsel's failure to present it.

C. Ineffective Assistance of Counsel at Sentencing for Failure to Object to the Prosecutor's Inappropriate Comments

Duren claims that the prosecution made several improper remarks during its closing argument at the sentencing phase, that the comments rendered his trial fundamentally unfair,[10] and that his counsel was ineffective for failing to object to the remarks. Duren claims that the prosecutor, in his closing argument at the sentencing phase, suggested that the only reason Duren might have kept Bedsole alive was to use her sexually, suggested that the victim's killing had a

---

[10]    Duren's claim on the merits–i.e., that the improper remarks rendered his trial fundamentally unfair–is procedurally barred because Duren did not raise this due process claim at trial or on appeal. Duren has failed to demonstrate cause and prejudice in order to overcome this procedural default.

12

profound impact on her family, and argued that the jury would be responsible for future murders by Duren or others like him if the jury did not condemn him to die.[11]

We find no impropriety in the prosecutor's remark concerning the impact on the victim's family. See Payne v. Tennessee, 501 U.S. 808, 828-31, 111 S.Ct. 2597, 2609-11, 115 L. Ed. 2d 720 (1991)(holding such evidence is constitutionally admissible)(overruling Booth v. Maryland, 482 U.S.496, 107 S.Ct 2529, 96 L. Ed. 2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L. Ed. 2d 876 (1989)).  With respect to the prosecutor's argument concerning future murders by Duren or others, we believe that the jury reasonably interpreted those remarks as referring to either specific or general deterrence, and thus we find no impropriety.  See Brooks v. Kemp, 762 F.2d 1383, 1407 (11th Cir. 1985)(en banc)(finding that arguments based on special and general deterrence are appropriate in light of accepted penalogical  justifications for use of death as a punishment).[12] Thus, the only comment that concerns us is the suggestion that the evidence gave rise to a reasonable inference that the only reason Duren would have spared Bedsole's life was to use her sexually.

We assume impropriety in this prosecutorial remark, and consider whether or not Duren can satisfy the prejudice prong of his claim of ineffective assistance of counsel on account of counsel's failure to object.  We must evaluate whether or not there is a reasonable probability

---

[11]     Duren also argues that the prosecutor suggested that the jury's imposition of a death sentence could substitute for, and thus would be analogous to, actually preventing the crime, which of course any jury would have wanted to do.  However, we do not believe that a reasonable juror could so interpret the prosecutor's argument.

[12] Cert. granted, Kemp v. Brooks, 478 U.S. 1016, 106 S.Ct. 3325, 92 L. Ed. 2d. 732 (1986)(vacating Brooks and remanding for further consideration in light of Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 92 L. Ed. 2d 460 (1986)), reinstated on remand, Brooks v. Kemp, 809 F.2d 700 (11th Cir. 1987).

13

that the result of the sentencing proceeding would have been different if counsel had objected. In this evaluation, we weigh the fact that the evidence against Duren at sentencing was overwhelming: he confessed twice to binding and shooting the couple, execution-style. See Harich v. Wainwright, 813 F.2d 1082, 1095 (11th Cir. 1987)(holding that graphic nature of murder weighs against finding of prejudice), aff'd in pertinent part, 844 F.2d 1464, 1468-69 (11th Cir. 1988) (en banc). We also observe that the sentencing judge admonished the jury to confine itself to the evidence in recommending sentence. Finally, we note that the prosecution did not dwell on the inappropriate comment. See Brooks, 762 F.2d at 1415 (finding that potential prejudicial effect of undesirable prosecutorial commentary was minimized by its brevity). Indeed, in the instant case, the inappropriate comments were not only brief, but were belied by the context of the prosecutor's own statements. The comment was made as the prosecutor was ridiculing Duren's story that he intended to kill only Leonard and that he did not intend to kill Bedsole. The gist of the prosecutor's argument was that it made no sense to eliminate only one of two witnesses. Thus, the context of the prosecutor's statements indicate that even the prosecutor did not believe Duren intended to keep Bedsole alive for any reason.

Under all the circumstances, we cannot conclude that there is a reasonable probability that the result of the sentencing proceeding would have been different if counsel had objected to the inappropriate prosecutorial remark.

D. Ineffective Assistance of Counsel at Sentencing for Failure to Object to Certain Jury Instructions

Duren further claims that his counsel's failure to object to the allegedly defective jury instructions denied him effective assistance of counsel.[13] This claim is based upon three alleged mistakes by the trial court to which Duren argues that his counsel should have objected: 1) failing to give a discretionary mercy charge (reminding the jury of its option to return life without parole); 2) charging the jury that it must recommend death if it found the aggravating circumstances outweighed the mitigating ones; and 3) instructing the jury that its role was advisory in recommending a sentence. We reject each of these arguments in turn.

Duren's first assertion–that his counsel should have insisted on the jury being instructed concerning its option to return a sentence of life without parole–fails under the prejudice prong of Strickland. Duren's counsel argued persuasively and at length about mercy, without contradiction by the trial judge or the prosecutor. Under the circumstances of the case, the absence of such an instruction or a general mercy charge does not establish a reasonable

---

[13] Duren also challenges the allegedly defective jury instructions on the merits. However, because the jury instructions were not challenged on appeal in state court, this claim is procedurally barred, and Duren has failed to demonstrate the requisite cause and prejudice to surmount such default. Attempting to avoid procedural bar with respect to the instruction that the jury's role was advisory, Duren argues that the Court of Criminal Appeals, 590 So.2d at 367-68, ruled on the merits of this challenge to the jury instructions. We disagree. We believe that the court addressed the claim only in the context of a claim of ineffective assistance of counsel for failing to object to the instructions. This was not a ruling on the substantive claim which would avoid the procedural bar. See Levasseur v. Pepe, 70 F.3d 187, 192 (1st. Cir. 1995)(finding that prior court's treatment of petitioner's underlying constitutional claims in the context of ruling on his ineffective assistance claim did not preserve constitutional claims for review on collateral attack).

probability that the result of the sentencing phase would have been different had such an instruction or charge been given.

Duren's next assertion–that the second jury instruction listed above had the effect of improperly mandating a death sentence and should have been objected to–is also unpersuasive. Because the jury was instructed to recommend death only if it found that the aggravating circumstances outweighed the mitigating circumstances, we doubt that the effect of the instruction was to mandate a death sentence. However, we need not address that issue because we conclude that this claim also fails under the prejudice prong of Strickland.

As noted above, defense counsel was permitted to argue extensively for mercy at sentencing. Counsel's argument in this regard went without challenge from either the prosecutor or the court. The court charged the jury that any facet of the defendant's character be considered in mitigation along with any aspect of the offense. Therefore, the range of mitigating circumstances available to the jury was unlimited. Under all of the circumstances, we cannot conclude that a reasonable probability exists that the result of the sentencing proceeding would have been different in absence of the instruction at issue.

Duren's third assertion--that Appell failed to object to the trial court's instruction that the jury's role in returning a sentence was merely advisory--also fails for want of prejudice under Strickland. Duren argues that this instruction violated Caldwell v. Mississippi,[14] 472 U.S. 320,

---

[14] In Caldwell, the United States Supreme Court held that certain comments made by the prosecutor to the jury to the effect that the jury did not have final responsibility with respect to the imposition of the death penalty violated the defendant's Eighth Amendment rights. Id. at 341, 105 S.Ct. at 2646. The prosecutor's statements were "inaccurate [and] . . . misleading" as to the jury's function and "fundamentally at odds with the role that a capital sentencer must perform." Id. at 337, 105 S.Ct. at 2643.

16

105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and thus Appell, as a matter of rudimentary competence, should have challenged it. We reject Duren's argument for several reasons.

At Duren's sentencing, the trial court properly informed the jury that its role was "advisory" pursuant to Alabama law and further elaborated upon its function by actually reading Ala. Code § 13A-5-46(d) (1975). The jury instruction was entirely consistent with Alabama law. In outlining the jury's proper sphere, the court did not mislead the jury, diminish its importance, or absolve it of responsibility for its decision. See Harich v. Dugger, 844 F.2d 1464, 1473 (11th Cir. 1988)(holding that informing jury of its "advisory" function does not violate Caldwell).[15] Rather, unlike the prosecutor's comments in Caldwell, the instruction given by the trial court in this court was accurate and in accordance with Alabama law. Thus, Duren cannot satisfy the prejudice prong of Strickland, and his ineffective assistance of counsel claim must fail.

In sum, there is no reasonable probability that Appell's failure to object to any of the three challenged instructions altered the result of the sentencing proceeding. Consequently, Duren was not prejudiced and his claim fails under Strickland.

E. Denial of Funds for Psychiatrist in Violation of Ake

Duren next argues that he was improperly denied funds with which to procure a psychiatrist and/or a psychologist in violation of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087,

---

[15] This court in Harich held that "a Caldwell violation should include some affirmative misstatement or misconduct that misleads the jury as to its role in the sentencing process." Harich v. Dugger, 844 F.2d 1464, 1473 (11th Cir. 1988). There was no such affirmative misinformation in this case.

84 L.Ed.2d 53 (1985).  In Ake, the Supreme Court held that an indigent defendant who shows that his sanity at the time of the offense will be a significant factor at trial must have access to a competent psychiatrist, thus enabling him to present an effective defense. Ake, 470 U.S. at 83, 105 S.Ct. at 1097.  This right emanates from the Due Process Clause's guarantee of fundamental fairness. Id. at 83, 105 S.Ct. at 1097.

Before this due process right is triggered, however, the defendant must show "a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." Moore v. Kemp, 809 F.2d 702, 712 (11th Cir. 1987).  This includes demonstrating, as a preliminary matter, "a substantial basis for the defense." Id.  In short, the trial court should be notified as to why an expert is necessary to afford the defendant a fair trial.

Unlike the defendant in Ake, however, Duren made no such showing to the trial court in this case.  His pre-trial motion requesting funds for a psychiatrist and/or psychologist merely listed several statutory mitigating factors and baldly asserted a need for the requested medical experts to assist in determining whether mitigators existed.  Neither in the motion nor at the hearing on the motion was the judge given any factual support for the possibility that one or more of such mitigating circumstances might exist.  We readily conclude that Duren failed to make the showing required by Moore.  In addition, when the trial court offered an evaluation by a state psychologist, Duren rejected this assistance.  We cannot conclude that Duren was denied a fundamentally fair trial because he was not provided funds to hire a psychiatrist.  His reliance on Ake is therefore misplaced.

18

F. The Failure of the Substitute Judge to Personally Hear All the Witnesses

Finally, Duren argues that the sentencing judge's failure to personally hear all of the evidence violated the Confrontation Clause. It is worth recounting the relevant facts. On March 7, 1984, a unanimous jury found Duren guilty of capital murder. Pursuant to Ala. Code § 13A-5-46 (1975), a sentencing hearing before the jury was commenced the same day. At the hearing, the State presented no witnesses, but instead asked the court to adopt the prior trial record demonstrating the relevant aggravating circumstances. The court agreed. Duren called seven witnesses, including himself, to testify to his unfortunate childhood in an effort to establish mitigating circumstances. After considering all of this evidence, the jury recommended a sentence of death. Pursuant to Ala. Code § 13A-5-47, a separate sentencing hearing was scheduled to take place before the trial judge, Judge Joseph Jasper, on May 4, 1984.

Before the hearing transpired, however, Judge Jasper learned that Duren was the fifth cousin of his deceased wife. Judge Jasper informed the parties of his wife's distant relation to Duren. The next day, May 1, he wrote to the Judicial Inquiry Commission, seeking counsel concerning his recusal. On May 14, 1984, Duren's counsel filed a motion for Judge Jasper's recusal. The Commission wrote back by letter dated May 28, 1984, advising him that recusal was unnecessary.

Despite the Commission's advice, Judge Jasper recused himself pursuant to Duren's motion, and the case was assigned to Judge James Garrett for sentencing. Upon transfer to Judge Garrett, Duren filed a motion for new trial, or, alternatively, a new jury sentencing hearing, on the ground that a judge who has neither heard the evidence himself nor had the opportunity to

19

observe the demeanor of the witnesses cannot fix sentence under Alabama death penalty law. Judge Garrett denied the motion, explaining that he had read the trial transcript and familiarized himself with all of the trial proceedings and each side's witnesses. He further reasoned that either side could present whatever witnesses it wished at the sentencing hearing. Thus, if either side felt a particular witness's demeanor was favorable to its case, Judge Garrett invited it to present that witness before him. Concluding that this arrangement was fair for both sides, Judge Garrett held the sentencing hearing on September 14, 1984.

At the hearing, Duren did recall almost all of the witnesses that he had previously presented before the jury; they testified again to Duren's troubled childhood in front of Judge Garrett. The State, on the other hand, called no witnesses, but relied (as it had in the earlier sentencing hearing before the jury) on the court's adoption of the trial transcript. Duren objected to this adoption, restating the grounds for objection set out in his motion for new trial–that Judge Garrett had not heard the evidence himself or observed the witnesses himself–and thus maintained that Judge Garrett was constitutionally unequipped to determine sentence.

In support of his confrontation argument, Duren cites Profitt v. Wainwright, 685 F.2d 1227, 1254 (11th Cir. 1982), for the proposition that the Confrontation Clause applies to capital sentencing proceedings. In light of the Clause's applicability, Duren contends, the State should have been forced to present its witnesses in person again before Judge Garrett at sentencing. While Duren's characterization of Profitt is correct, we disagree with him that its holding compels a finding of constitutional error in this case. In Profitt, the defendant's mental state at the time the offense was committed was at issue. Id. at 1250. After the jury had returned a guilty verdict and recommended a death sentence, the trial judge suggested that the defendant be

20

examined by two court appointed psychiatrists before the final sentence determination. Id. The defendant agreed; two doctors later examined the defendant and submitted reports, both finding that the defendant knew right from wrong when he committed the offense. Id. At the hearing set for discussing the reports, however, only one doctor showed up to testify. Id. Defense counsel asked the court for the opportunity to cross-examine the absent doctor. Id. The judge agreed, stated that the doctor's testimony would later be made part of the record, but proceeded to sentence the defendant without it. Id at 1255. Thus, the judge considered the absent doctor's report in his sentencing, and the defendant was denied an opportunity to cross-examine the adverse expert witness before sentence was imposed. Id.

The instant case is fundamentally different than Profitt. Here, Duren was permitted to fully cross-examine all of the State's witnesses during the guilt phase of the trial. The State presented no new witnesses at the sentencing hearing before Judge Garrett. Thus, unlike the defendant in Profitt, Duren was not denied the cross-examination of a single witness, much less one as critical as a psychiatrist devastating an insanity defense. In addition, Judge Garrett expressly conferred on Duren the unlimited right to call any witnesses he desired, including those who had earlier testified for the State. If Duren had felt it essential for the sentencing judge to observe the State's witnesses for himself, then Duren could have certainly called them before Judge Garrett. Duren's full cross-examination of the State's witnesses at trial and his opportunity to call any witnesses he wished at sentencing persuade us that there was no Sixth Amendment error.

Moreover, according to the Supreme Court, the Confrontation Clause is designed, through the vehicle of cross-examination, "to promote reliability in the truth-finding functions of

21

a criminal trial." Kentucky v. Stincer, 482 U.S. 730, 107 S.Ct. 2658, 96 L. Ed. 2d 631 (1987); see also Profitt, 685 F.2d at 1254 (stressing reliability of factfinding underlying capital sentencing). We have no doubt that the evidence examined by Judge Garrett before imposing sentence was sufficiently reliable for the purposes of the Sixth Amendment. As mentioned earlier, Duren had fully cross-examined the State's witnesses, and such examination was clearly reflected in the record reviewed by Judge Garrett. In addition, Judge Garrett informed Duren's counsel three weeks before the sentencing hearing that Duren would be permitted to present any witnesses he wished at sentencing. In light of the capital nature of this case, Duren had, at all times, a very strong motive to fully develop the record. Given this powerful motive, the complete cross-examination he was permitted at trial, and his unlimited option to present any witnesses he chose at sentencing, we cannot conclude that Duren was denied any right under the Confrontation Clause to be sentenced on the basis of reliable information.

### CONCLUSION

For the foregoing reasons, the judgment of the district court denying relief is AFFIRMED.[16]

---

[16] All other arguments are without merit and warrant no discussion.

22