Gary Leon BROWN, Petitioner-Appellant,

v.

Charlie P. JONES, Warden, Bill Pryor, Attorney General, State of Alabama, Respondents-Appellees.

No. 99-14261.

United States Court of Appeals,

Eleventh Circuit.

June 29, 2001.

Appeal from the United States District Court for the Northern District of Alabama.(No. 95-01792-CV-C-S), U.W. Clemon, Chief Judge.

Before ANDERSON, Chief Judge, and EDMONDSON and DUBINA, Circuit Judges.

ANDERSON, Chief Judge:

## I. FACTS AND PROCEDURAL HISTORY

On May 26, 1986, Gary Leon Brown, Archie Bankhead, James Bynum, and Jimmy Davenport went fishing near Locust Fork, Alabama, about thirty miles north of Birmingham. The men drank alcohol while they fished and then went to Chuck and Willie's Lounge in Birmingham, where they continued to drink and played pool.

While at the lounge, Brown, Bankhead, and Bynum discussed the possibility of going to Jack McGraw's home in Pinson, Alabama, to obtain money. Brown and Bynum were both familiar with McGraw. The four men then left the lounge and headed to McGraw's home. Davenport drove, and Bynum gave directions. When they arrived at McGraw's home that night, Davenport remained in the car, while Brown, Bankhead, and Bynum went to McGraw's door and knocked. McGraw let them in and said that he could not "party" with them that evening because he had to go to work the next morning. When the three men began to leave, McGraw walked outside with them. Bankhead then grabbed McGraw in a headlock, and Brown and Bynum began hitting McGraw. Davenport also saw Brown make a "slashing" movement at McGraw's neck. McGraw and Bankhead fell to the ground and struggled. Bankhead, Brown, and Bynum then picked up McGraw and carried him inside his home. Brown recalled Bankhead saying that they would have to kill McGraw, because McGraw had seen Bankhead. Brown admitted that he repeatedly stabbed McGraw in the back with a small pocket knife. He claimed that either Bankhead or Bynum caused the fatal wounds to

McGraw's neck area.[1]

After killing McGraw, Bankhead, Brown, and Bynum gathered McGraw's possessions, loaded them in Davenport's car, and drove to Bankhead's house, where they divided the stolen property and the money from McGraw's wallet and burned their clothes which were covered in blood. According to Bankhead's wife, the men joked about the murder. She overhead Brown telling Bankhead how he "kept stabbing and stabbing and stabbing and stabbing" McGraw. She also heard Bankhead and Bynum stating that they had cut McGraw's neck. The next afternoon McGraw's body was discovered by a neighborhood child.

A few days later Jefferson County deputy sheriffs found Brown at Bankhead's house. Brown accompanied them to the Center Point substation and gave them a statement that he and the other three men had gone fishing, to the bar, and then home. After giving this statement, Brown rode with the officers to Bynum's house, where the officers questioned Bynum while Brown remained in the squad car with one of the officers. Bynum told the officers that Brown had inflicted all the stab wounds on McGraw and struck his head with a skillet. Brown claims that the officers returned to the squad car, arrested him, and told him that Bynum's statement reflected that Bankhead stabbed McGraw and was the ringleader. Brown then gave a second statement to the officers to the effect that Bankhead had inflicted all of the wounds on McGraw. Later, after Brown learned that Bankhead had been arrested, Brown gave a third statement in which he admitted that he stabbed McGraw in the back repeatedly with a pocket knife and participated in the robbery along with Bynum and Bankhead.

Brown was indicted for the capital offense of the murder of Jack McGraw during a robbery in violation of § 13A-5-40(a)(2), Code of Alabama 1975. Brown's appointed counsel was Russell T. McDonald, Jr. The jury found Brown guilty of capital murder as charged in the indictment. After the penalty phase of the trial, the jury returned an advisory verdict for death by a vote of ten to two. After a sentencing hearing, the trial judge accepted the jury's recommendation and sentenced Brown to death. On direct appeal, the Alabama Court of Criminal Appeals, *Brown v. State,* 545 So.2d 106 (Ala.Crim.App.1988), and the Alabama Supreme Court, *Ex parte Brown,* 545 So.2d 122 (Ala.1989), affirmed Brown's conviction and death sentence. The United States Supreme Court denied Brown's petition for writ of certiorari. *See Brown v. Alabama,* 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 206 (1989). On February 16, 1990, Brown filed a petition for

---

[1]McGraw suffered at least fifteen cuts to his neck, including several deep wounds striking his carotid artery and jugular venous complex. He suffered fifty-nine stab wounds to his back, the deepest of which were two inches deep.

post-conviction relief under Temporary Rule 20 of the Alabama Rules of Criminal Procedure.[2] Brown twice amended his Rule 20 petition. An evidentiary hearing was held on Brown's petition, and on January 21, 1990, the Rule 20 court denied the petition. The Alabama Court of Criminal Appeals affirmed the denial of the Rule 20 petition, and the Alabama Supreme Court denied Brown's petition for writ of certiorari. *See Brown v. State,* 663 So.2d 1028 (Ala.Crim.App.), *cert. denied,* 663 So.2d 1028 (Ala.1995). Brown then petitioned the district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[3] On October 1, 1999, the district court denied the petition, holding that most of Brown's federal constitutional claims were procedurally barred and that his remaining claims failed on the merits.

On appeal, Brown argues that his trial counsel was ineffective at both the guilt and penalty phases of his trial because he failed to investigate and present evidence of Brown's drug and alcohol abuse and its effects upon his mental state at the time of the crime. He also argues that his trial counsel was ineffective in failing to question the jurors during voir dire to identify those who were biased in favor of the death penalty. Brown then argues that his trial was rendered fundamentally unfair because Davenport's testimony was procured through coercive prosecutorial tactics. For the reasons stated below, we affirm the district court's denial of Brown's habeas petition.[4]

## II. DISCUSSION

*A.      Ineffective Assistance for Failure to Introduce Evidence of Brown's Alcohol and Drug Use*

Brown asserts that he received ineffective assistance during the penalty phase of his trial because counsel failed to investigate and present evidence of Brown's drug and alcohol use and its effects upon his mental state. The district court denied Brown's claim, emphasizing the Rule 20 court's findings that counsel's

---

[2]The rule is now Rule 32 of the Alabama Rules of Criminal Procedure, but we will refer to the state post-conviction proceedings as the Rule 20 proceedings.

[3]Because Brown's habeas petition was filed on July 14, 1995, prior to the enactment of the Anti-Terrorism and Effective Death Penalty Act (AEDPA) on April 24, 1996, which amended portions of 28 U.S.C. § 2254, we review Brown's petition under the pre-AEDPA standard. *See Mincey v. Head,* 206 F.3d 1106, 1130 n. 58 (11th Cir.2000).

[4]Brown also argues on appeal that the state trial court's failure to instruct the jury that it did not have to be unanimous as to mitigating circumstances deprived him of a right to a constitutional sentencing hearing and that the state trial court's jury instruction on reasonable doubt impermissibly shifted the burden of proof. We agree with the district court that both of these claims are procedurally defaulted and thus we do not address these claims. Brown additionally argues that the district court erred in not affording him an evidentiary hearing. We conclude that the district court did not abuse its discretion in failing to hold an evidentiary hearing.

failure to present such evidence was part of his unified guilt and punishment phase strategy. Brown argues that any such strategy was chosen without reasonable investigation or preparation.

Claims of ineffective assistance during the sentencing phase of a capital case are subject to the two-prong analysis set out by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To make out a successful claim, Brown must show (1) that his counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *See id.* at 687, 104 S.Ct. at 2064. Ineffective assistance is a mixed question of law and fact, and our review is *de novo. See Williams v. Head,* 185 F.3d 1223, 1227 (11th Cir.1999).

1.      Performance Prong

Under the performance prong, the standard is "reasonableness under prevailing professional norms." *See Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065. Trial counsel cannot be deemed "incompetent for performing in a particular way in a case, as long as the approach taken 'might be considered sound trial strategy.' " *Chandler v. United States,* 218 F.3d 1305, 1314 (11th Cir.2000) (en banc) (quoting *Darden v. Wainwright,* 477 U.S. 168, 186, 106 S.Ct. 2464, 2474, 91 L.Ed.2d 144 (1986)).

McDonald had over thirty years of experience in the practice of criminal law and had prosecuted or defended dozens of capital cases. We have stated that the "strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel." *Chandler,* 218 F.3d at 1316 (quoting *Provenzano v. Singletary,* 148 F.3d 1327, 1332 (11th Cir.1998)). "The more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense ... was reasonable under the circumstances." *Gates v. Zant,* 863 F.2d 1492, 1498 (11th Cir.1989).

This is not a case where counsel failed to investigate with respect to Brown's drug and alcohol use. McDonald testified at the Rule 20 hearing that he was aware of Brown's background of drug and alcohol use and had discussed it with him. Based on his more than thirty years of experience in trying cases in Jefferson County, Alabama, McDonald testified that he believed that jurors are prejudiced against criminal defendants who use drugs. McDonald testified that there was plenty of evidence of Brown's drug and alcohol abuse that he could have presented at the penalty phase of the trial, but he rejected this line of defense in favor of one he believed would be more effective: that Brown, who had a boyish appearance at the time of trial, was a "follower" who was led into an act inconsistent with his character by Bankhead, his co-Defendant, who was

older and violent and had a more hardened look.

We readily conclude that McDonald's decision not to present evidence of Brown's drug and alcohol use at the penalty phase in favor of a defense that he thought would be more favorable was a reasonable tactical decision. *See, e.g., Duren v. Hopper,* 161 F.3d 655, 661 (11th Cir.1998) (readily concluding that counsel's decision not to present evidence of defendant's history of substance abuse during the penalty phase of trial was reasonable).

2.      Prejudice Prong

In order to prevail on this claim, Brown would also have to establish prejudice from his counsel's unreasonable assistance. *See Horton v. Zant,* 941 F.2d 1449, 1463 (11th Cir.1991). A petitioner satisfies the prejudice prong when he shows that trial counsel's deficient performance deprived him of "a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

We conclude that, in addition to failing to establish the performance prong of his *Strickland* claim, Brown has also failed to establish the prejudice prong. At the Rule 20 hearing, Brown presented witnesses whom he contended McDonald should have called at trial. The Rule 20 court found that the testimony of these witnesses either would not have been helpful to Brown or that such testimony was not credible. The Rule 20 court found that the testimony of Brown's family members and friends concerning Brown's drug use was exaggerated in an attempt to make him appear to have a greater drug problem than he actually had. The Rule 20 court also found that the amount of alcohol that Brown claimed to have consumed on the day of the robbery/murder was substantially less than he claimed to consume on a regular basis prior to the day of the crime. The Rule 20 court found that Brown had not suffered from delirium tremors or other withdrawal symptoms, had exaggerated his drug use, and was not a credible witness. The Rule 20 court also concluded that the testimony of Dr. Kirkland, Brown's expert witness, that Brown suffered from diminished capacity at the time of the crime due to alcohol or drug use would not have outweighed the aggravating factors against Brown. Furthermore, the state's expert, Dr. Dixon, testified that Brown exaggerated his claims of drug and alcohol abuse. Especially in light of the Rule 20 court's findings of fact, we agree with the conclusion of the Rule 20 court that the evidence of Brown's drug and alcohol abuse would not have been helpful to him; "there is no reasonable probability that the result of the penalty phase would have been different, even if the

suggested evidence of alcohol and drug abuse had been explored in great detail." *Duren,* 161 F.3d at 662.[5]

B.       *Ineffective Assistance for Failure to Engage in "Reverse-Witherspoon"*[6] *Inquiry During Voir Dire*

Brown also argues that McDonald rendered ineffective assistance when he failed to ask potential jurors during voir dire whether they would automatically vote to impose the death penalty if Brown were convicted of capital murder—a so-called "*reverse-Witherspoon*" inquiry.  The Rule 20 court and the district court rejected this claim.

1.       Performance Prong

At the Rule 20 hearing, Brown offered the testimony of two Birmingham lawyers, Dan Turberville and Roger Appell, who testified that they always engage in such "reverse-*Witherspoon*" questioning during voir dire.  The Rule 20 court found that the testimony of these two lawyers did not establish that McDonald's failure to ask the reverse-*Witherspoon* question during voir dire showed that his performance was inadequate, because McDonald had as much, if not more, experience in criminal defense than either of these lawyers.

McDonald was not asked any questions during the Rule 20 hearing regarding his failure to engage in a reverse-*Witherspoon* inquiry.  Although during voir dire the trial judge asked the potential jurors a few questions to determine whether any of them was unalterably opposed to the death penalty, this questioning was limited.  Thus, McDonald may well have thought it better to avoid any focus on the death penalty. McDonald's decision not to ask potential jurors whether they would automatically vote to impose the death penalty if Brown were convicted of capital murder appears to have been a reasonable tactical decision, because it seems reasonable for trial counsel to want to focus the jury on the idea of the death penalty as little as possible.  Moreover, there is a strong presumption that McDonald's actions were the result of sound trial strategy.  *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.  Nevertheless, we need not decide whether Brown failed to establish the performance prong on this claim, because we conclude that he failed to establish the prejudice prong.

---

[5]Brown also claims that he received ineffective assistance due to McDonald's failure to present evidence of his drug and alcohol use during the guilt phase of his trial.  Because we conclude that McDonald made a reasonable tactical decision not to present evidence of Brown's substance abuse, given his opinion, based on years of experience, that juries are unsympathetic to drug users, especially those like Brown who also dealt drugs, we hold that Brown has failed to establish a claim of ineffective assistance with respect to the guilt phase of his trial.

[6]The voir dire inquiry used to determine whether there are jurors who would vote automatically to impose the death penalty if a defendant were found guilty of a capital crime is referred to as the "reverse-*Witherspoon*" inquiry, because it arose from a line of death penalty voir dire cases exemplified by *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

2.       Prejudice Prong

   In order to establish the prejudice prong, Brown would have to show that, but for McDonald's failure to engage in the reverse-*Witherspoon* inquiry during voir dire, the result of his trial would have been different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. For several reasons we conclude that Brown has failed to make the required showing. First, during the penalty phase of the trial, the trial judge instructed the jurors that their verdict should be based on the evidence and the law and that there was no room for passion, prejudice, or other arbitrary factors. Brown argues that we should presume that some of the jurors were biased in favor of the death penalty and would have refused to follow the law. We have stated in numerous cases, however, that jurors are presumed to follow the court's instructions. *See e.g., Ingram v. Zant,* 26 F.3d 1047, 1053 (11th Cir.1994) ("Because we presume that jurors follow such instructions, we must assume that the jury put aside any biases it may have had, applied the legal standards as enunciated in the jury instructions, and based its sentencing decision on the facts introduced at trial and sentencing."); *Raulerson v. Wainwright,* 753 F.2d 869, 876 (11th Cir.1985) ("Jurors are presumed to follow the law as they are instructed."). Because we presume that the jurors followed the court's instructions to base their sentencing decision on the evidence and the law, and not on arbitrary factors, Brown's attempt to prove prejudice is undermined. *See Stamper v. Muncie,* 944 F.2d 170, 177 (4th Cir.1991) (holding that petitioner, who alleged ineffective assistance based on counsel's failure to "explore with certain members of the venire the 'reverse-*Witherspoon*' inquiry," failed "to demonstrate how any shortcoming on trial counsel's part constituted prejudice sufficient to satisfy the second prong of the *Strickland* test").[7] Second, Brown failed to adduce any evidence that any juror was biased in favor of the death penalty. Third, the heinous nature of the crime and the absence of any mitigating factors make this a case in which the prosecutor had a strong case for the death penalty. For these reasons, we conclude that Brown has failed to show that McDonald's decision not to engage in the reverse-*Witherspoon* inquiry with the jury resulted in prejudice sufficient to satisfy the second prong of *Strickland.*

C.       *Davenport's Testimony*

---

   [7]This case is distinguished from *Ex parte Yelder,* 575 So.2d 137 (Ala.1991), where the Alabama Supreme Court presumed prejudice where trial counsel did not object, under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to the state's use of its peremptory challenges to strike 17 out of 18 black jurors. In *Yelder,* there was a prima facie case of purposeful discrimination by the state in the jury selection process. *See* 575 So.2d at 138-39. In this case, Brown cannot show that any juror was predisposed to impose the death penalty nor that any juror would have responded to or been excused because of a reverse-*Witherspoon* inquiry.

Brown argues that his conviction and death sentence violated his Eighth and Fourteenth Amendment rights because Davenport's testimony, which was directly related to the issue of Brown's intent, was procured through coercive prosecutorial tactics.[8]  Brown analogizes his conviction to one obtained through the use of perjured testimony.  He argues that, where a witness's testimony has been coerced, this creates an unacceptable risk that a conviction might be obtained based upon perjured testimony.

When Davenport was interviewed by deputies shortly after McGraw's murder, he apparently admitted much of the involvement to which he later testified at trial, including the fact that he drove Brown, Bankhead, and Bynum to McGraw's home on the fateful night, though he remained in the car.  However, in his statement to the officers at the time, he indicated that he had heard nothing about any plans to kill McGraw in the car on the way to McGraw's home.  Shortly before trial, Davenport was subpoenaed as a witness.  One of the prosecutors in the case, Mike Anderton, flew Davenport to Birmingham.  Anderton and Mike McGregor, the other prosecutor in the case, met with Davenport the day before Brown's trial and interrogated him for two hours.  The entire interview was taped.  In response to a number of questions early in the interview, Davenport denied having heard any conversation about killing McGraw on the way to McGraw's home.  McGregor persisted in questioning Davenport about this, insisting that he must have heard some conversation on the way to McGraw's home.  Davenport finally said, "[They] said they was going to go over to a queer's house to do a job," and then admitted having heard Brown, Bankhead, and Bynum talking about hitting McGraw.  After Davenport asked whether he could be charged with this, one of the prosecutors said that he could be, but he probably would not be,[9] charged, but he went on to say that one case they would make if need be was perjury if he lied on the stand.  Anderton and McGregor told Davenport numerous times that he must tell the truth.

At trial, Davenport testified as to his involvement and what he saw and heard, including the fact that, on the way to McGraw's home, he heard a conversation in the car about "going and killing a queer, or something like that."  He did not recall who made that statement.  He also said that Brown and Bankhead both

---

[8]Respondents argue that this claim is procedurally defaulted because it was not raised at trial or on direct appeal.  The Rule 20 court found that the claim was procedurally defaulted.  The district disagreed, but dismissed the claim on the merits.  Because we agree with the district court that this claim fails on the merits, we need not decide whether this claim is procedurally defaulted.

[9]The prosecutor later explained that Davenport's involvement as the driver probably was not enough to make a case against him, because there was no apparent intent on the part of Davenport to take part in the crime.

asked Bynum how hard Bynum could hit. Davenport also testified that Brown asked Bynum, "Well, can you knock this old man out?," and Bynum responded "yes." According to Davenport's testimony, Brown responded, "Well, if you can't I can."

The interrogation methods used by the prosecutors when questioning Davenport fall short of the level of egregiousness necessary to constitute a violation of Brown's constitutional rights. *See Wilcox v. Ford,* 813 F.2d 1140, 1148 (11th Cir.1987). In *Wilcox,* the petitioner argued that testimony against him had been coerced from two witnesses and that this violated his due process rights and rendered his trial fundamentally unfair. *See* 813 F.2d at 1148. The two witnesses, both of whom were elderly, originally told the police that they knew nothing of the murder, but later, after extensive interrogation, signed statements attesting to their involvement, as well as the petitioner's involvement, in the crime. The district court held that the "intimidation tactics" used by the police violated the petitioner's constitutional rights. We reversed. The transcripts of the interrogation showed that the police had "threatened to charge [one of the witnesses] with murder, threatened to lynch him, put words in his mouth, and told him he was headed for eternal damnation." *Id.* at 1147. Another witness was interrogated for over eight hours without food or water and was told that he could be sent to the electric chair or would die in prison. *See id.* We held that, while the police misconduct was not commendable, the petitioner's due process rights were not violated and he had received a fundamentally fair trial. *See id.* at 1148-49. We reached this conclusion because the petitioner had full knowledge of the nature of the two witnesses' interrogation, had access to the tapes and transcripts prior to trial, had an opportunity to use those materials when examining both witnesses, and was able to cross-examine both witnesses. *See id.* at 1149.

The rejection of Brown's claim that his constitutional rights were violated because Davenport's testimony was coerced follows *a fortiori* from *Wilcox.* The interrogation here falls far short of the much more egregious interrogation which survived constitutional scrutiny in *Wilcox.* The interrogation in the instant case was almost mild-mannered compared to that in *Wilcox.* It lasted only two hours and was taped in its entirety. Brown's trial counsel, McDonald, knew about Davenport's testimony on the first day of trial; and, as in *Wilcox,* Brown's counsel had an opportunity to review the taped interrogation before he cross-examined Davenport. In fact, McDonald engaged in a lengthy cross-examination of Davenport concerning the interrogation and the changes in his testimony after the interrogation. The taped interrogation was also played for the jurors, which gave them an opportunity to evaluate whether the prosecutors had used improper

interrogation methods and whether the interrogation had resulted in untruthful testimony, and gave them an opportunity to assess the challenged interrogation and the reliability of Davenport's testimony. The jury obviously concluded that the interrogation did not result in untruthful testimony, but rather persuaded Davenport to abandon the few previous untruthful statements to officers and to give truthful testimony to the jury. Based on our own review of the challenged interrogation and Davenport's trial testimony, we conclude that Davenport's trial testimony was both voluntary and truthful. Therefore, we readily conclude that Brown's constitutional rights were not violated due to the introduction of Davenport's testimony.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court denying relief is AFFIRMED.