**D.H. FLEENOR, Petitioner–Appellant,**

v.

**Ron ANDERSON, Superintendent of Indiana State Prison, Respondent–Appellee.**

**No. 98–1916.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 16, 1998.

Decided March 24, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied June 7, 1999.*

---

* Hon. Kenneth F. Ripple, Hon. Ilana Diamond Rovner and Hon. Diane P. Wood voted to grant the petition for rehearing en banc.

Alan M. Freedman (argued), Midwest Center for Justice, Ltd., Chicago, IL; Carol R. Heise, Midwest Center for Justice, Chicago, IL, for Petitioner–Appellant.

Michael A. Hurst (argued), Office of the Attorney General, Indianapolis, IN, for Respondent–Appellee.

Before POSNER, Chief Judge, and COFFEY and RIPPLE, Circuit Judges.

**1098**

POSNER, Chief Judge.

In 1983 an Indiana state court convicted D.H. Fleenor of murder and sentenced him to death. After exhausting his state remedies, see *Fleenor v. State*, 514 N.E.2d 80 (Ind.1987); *Fleenor v. State*, 622 N.E.2d 140 (Ind.1993), he sought federal habeas corpus, lost, and appeals. The only challenges, here as in the district court, are to the sentence. District Judge Hamilton wrote a 97–page opinion; lucid and meticulous, the opinion thoroughly discusses and soundly resolves all the issues presented by Fleenor's highly competent and experienced counsel. We discuss only two issues, and for the rest rely entirely on Judge Hamilton's opinion.

The first and more important issue comes out of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In Mississippi, as in most states, the decision for or against death is made by the jury. The prosecutor told the jury that "your decision is not the final decision.... Your job is ... automatically reviewable by the Supreme Court." The trial judge explained to the jury that its verdict "is reviewable automatically as the death penalty commands." *Id.* at 325–26, 105 S.Ct. 2633. The Supreme Court held that this wording constituted reversible error; the suggestion that "the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role." *Id.* at 333, 105 S.Ct. 2633.

In Indiana, however, unlike Mississippi, the jury does not have the ultimate power of decision. The jury makes a recommendation to the judge about whether or not to impose the death penalty, but the judge is not required to follow the recommendation—it is his decision to make, not the jury's, Ind.Code § 35–50–2–9(e) ("The court shall make the final determination of the sentence after considering the jury's recommendation...; the court is not bound by the jury's recommendation")— although the Indiana courts have held that

he is required to give the recommendation "due consideration," *Fleenor v. State, supra*, 622 N.E.2d at 143, because the jury's recommendation is a "valuable contribution" to the sentencing process. *Brewer v. State*, 275 Ind. 338, 417 N.E.2d 889, 909 (1981); see also *Minnick v. State*, 698 N.E.2d 745, 760 (Ind.1998); *Saylor v. State*, 686 N.E.2d 80, 87 (Ind.1997); *Peterson v. State*, 674 N.E.2d 528, 543 (Ind. 1996). Such a system of capital sentencing is constitutionally permissible. *Harris v. Alabama*, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995); cf. *Schiro v. Farley*, 510 U.S. 222, 226–27, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994).

*Caldwell* cannot be applied literally to this case because the responsibility for the ultimate determination whether to impose the death penalty does not rest with the jurors, but with the judge. Several decisions of the Eleventh Circuit assume that *Caldwell* stands for the broader principle that the jury must not be led to believe that its decision for death will have less weight in the ultimate determination of the defendant's fate than state law gives it. *Johnston v. Singletary*, 162 F.3d 630, 643–44 (11th Cir.1998); *Duren v. Hopper*, 161 F.3d 655, 664 (11th Cir.1998); *Davis v. Singletary*, 119 F.3d 1471, 1481–85 (11th Cir.1997); *Julius v. Johnson*, 840 F.2d 1533, 1544 (11th Cir.1988) (per curiam). Two of the cases (*Johnston* and *Davis*) come from Florida, where the judge is required to give the jury's recommendation for or against death "great weight." *Tedder v. State*, 322 So.2d 908, 910 (Fla. 1975) (per curiam). There is no such requirement in Indiana—or in Alabama, where the other two Eleventh Circuit cases come from, but those cases do not discuss the significance of this difference. Nor do they hold—they merely assume without discussion—that the principle of *Caldwell* is applicable to capital cases from Alabama. In Indiana, the sentencing judge must give due consideration to the jury's recommendation, but he need not give it any particular weight. It is obscure

in these circumstances how a prosecutor or judge could mislead the jury about how much weight its recommendation would have. But let us set our doubt about Fleenor's being able to invoke *Caldwell* to one side and assume without having to decide that even in an Indiana death penalty case a sentence of death could be found unconstitutional if the jury had been misled concerning the significance of its recommendation.

■ Judge, prosecutor, and defense counsel all made clear repeatedly to the jury in this case that the jury's role in the sentencing process was to make a recommendation for or against death, and that although the recommendation (as the word "recommendation" implies) would not be binding on the judge, it would be given due weight and recognized as a "valuable contribution" to the sentencing process. So far, so good; the jury was told exactly what its proper role is under Indiana law. But the prosecutor and the judge said other things as well. In voir dire the judge told one juror that "your recommendation is just that. It's a recommendation; it is not binding on the Court.... The Court may ignore it; the Court can accept it. In the final analysis the decision will be up to the Court." The defendant fastens on the word "ignore" (which the judge used with another juror as well). But words must be read in context. When "ignore" is opposed not to "give careful attention to" but to "accept," and when the subject is "recommendation," "ignore" clearly means "not follow" rather than "pay no attention to." So what the judge was telling these jurors was true, and it was also something they were entitled to know, as the defendant concedes.

■ It was also at least as likely to help as to hurt the defendant. For it was used primarily to allay the concerns of prospective jurors troubled by capital punishment by pointing out to them that they would not have the full burden of responsibility for sending a person to his death even if they voted for the death penalty. Pro-

spective jurors who express adamant opposition to the death penalty are excludable for cause from the jury in a capital case. *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Smith v. Fairman*, 862 F.2d 630, 634 (7th Cir. 1988); *Foster v. Delo*, 39 F.3d 873, 881 (8th Cir.1994). The explanation of the jurors' role in an Indiana death case, of which the defendant now complains, made it more likely that the jury would include persons with qualms about the death penalty, and such persons were more likely than the average juror to be moved by defense counsel's impassioned plea (of which more shortly) to spare his client.

■ More troublesome is the disquisition on mistake in the prosecutor's rebuttal argument. He noted that there had been "a lot of talk [in defense counsel's closing argument] about what if we make a mistake." To this he responded:

The judge is going to consider your final recommendation.... He's gonna make the final decision. Number One. Number Two, the law of this State requires— it's not optional—it requires that every death penalty decision is reviewed by the Supreme Court of this State. The Supreme Court of Indiana is gonna, automatically, review a death penalty case in this State. There's governors; there's Federal Judges; U.S. Supreme Court Justices.... You are asked to make a recommendation—a serious recommendation. It's not the end of this case.... You're only part of it. The Judge is only part of it.... Maybe the Jury's wrong.... And then, we go to the Indiana Supreme Court ... and then beyond ... we know there are many other recourses if somebody's made a mistake in this kind of case.

This sounds much like what the prosecutor and the trial judge said in *Caldwell*. But there is a critical difference. The jury here already knew that it was not going to determine the defendant's penalty. It was a detail whether it thought the penalty was

going to be decided by just the trial judge, or by the trial judge plus the state supreme court and federal judges. In *Caldwell*, it was the jury that was going to decide the penalty subject only to limited judicial review, yet the jury may have inferred from what the prosecutor and trial judge said that their determination actually was subject to plenary review. In the present case, the jury wasn't going to *decide* anything; or, stated differently, its decision *would* be subject to plenary review, by the trial judge. Everyone knows that after a death sentence is imposed, there are tiers of appellate review designed to catch errors; the prosecutor wasn't telling the jurors anything they didn't know already. Appellate review is a fact of almost all criminal cases that are tried. Knowledge of this does not cause jurors to take lightly their sentencing responsibilities.

It could be argued that the very fact that Indiana juries have only a recommending role in capital sentencing makes any dilution of their role particularly dangerous. If they are told not only that their recommendation is weightless but also that they are backstopped by endless tiers of appellate review, they may go about their business with an unseemly casualness. But they were told nothing that is not true. Under Indiana law, the judge is not required to give their recommendation weight; and all capital sentences are multiply reviewable. The objection if any is not to what the jurors in this case were told, but to the Indiana system, the constitutionality of which is not, however, challenged.

If, as we greatly doubt, the prosecutor went too far, it was either in mentioning appellate courts at all (but surely that added nothing to what the jurors knew already) or in failing to explain that while the trial judge would be making the sentencing decision, subsequent review would be largely limited to mistakes of law. We cannot believe that the jury's deliberations would have been affected by either altera-

tion—especially when we consider the closing argument of the defense counsel, to which the prosecutor was replying. The defense counsel explained to the jury, passionately and at length, that while his client had killed out of anger (he had killed the mother and stepfather of his estranged wife), they, the jurors, if they recommended death for his client, would be participating in a premeditated killing motivated solely by a thirst for revenge (for counsel had argued that revenge is the only possible motive for the death penalty). "I would hope," he told the jurors, "that you resent being made party to the premeditated killing of a person out of revenge.... We are diminished when we deliberately participate in the taking of the life of another human being and, especially, if the best justification is that of revenge." He emphasized each juror's personal responsibility:

> There is no way that you can ever escape or avoid the responsibility for recommending to take the life of a fellow ... human being. This is a personal responsibility that exists in this courtroom, today, and is upon the shoulders of each one of you.... Surely one of you will stand before your fellow Jurors and argue for D. to—to say why we should not kill him.

To drill the point home, he told the jury a story about two boys walking in the woods, one holding an injured bird in his hand. The other boy urges the first boy to kill the bird. "This prosecutor wants you to kill D.H. Fleenor. It's in your hands now." And counsel added, "You are in a unique position.... You can extend mercy to D. Fleenor." This was of course wrong; the judge could override the jury's recommendation for mercy. *Minnick v. State, supra*, 698 N.E.2d at 760. Counsel also emphasized the possibility of error in a death case, where the judgment once executed cannot be recalled. He kept saying such things as, "How can you be sure that your decision to recommend the death

penalty for D.H. Fleenor is, indeed, correct?"

It was no doubt because the defendant's lawyer tried to distract the jury from its circumscribed role in capital sentencing—to make the jurors think they would be pulling the switch as it were and that no error they made could be undone—that the prosecutor emphasized the jury's limited role. Maybe he overemphasized it slightly; but if so he merely restored a balance disturbed by defense counsel. At the argument in our court, the defendant's present counsel conceded that trial counsel had gone beyond the proper bounds of advocacy. He had seriously misrepresented the role of the jury in an Indiana capital case; he had implied that each juror was judge, jury, and executioner all rolled into one.

Just the other day the Supreme Court noted the acute difficulties involved in resentencing a defendant after many years (17 in that case, 15 in ours), and emphasized that even in a capital case the defendant must show that he was actually prejudiced by the errors of which he is complaining. *Calderon v. Coleman,* —— U.S. ——, 119 S.Ct. 500, 503–04, —— L.Ed.2d —— (1998) (per curiam). In this case it would be entirely conjectural to suppose that the jury would not have recommended the death penalty had the prosecutor omitted a reference to appellate review of death sentences. Cf. *Jones v. Butler,* 864 F.2d 348, 360–61 (5th Cir. 1988).

■ The only other issue we need discuss arises from the prosecutor's use in rebuttal in the sentencing hearing of the report of a psychiatrist who had examined the defendant to determine his sanity at the time of the trial and of the murders. The Supreme Court has held that it violates the constitutional right to the assistance of counsel to place into evidence against a defendant the result of a pretrial psychiatric examination of which the defendant's lawyer had been unaware; and, more to the point—since Fleenor's lawyer did know about the examination—it is likewise unconstitutional to put into evidence the result of a pretrial psychiatric examination the *scope* of which the lawyer was unaware of. *Estelle v. Smith,* 451 U.S. 454, 471, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); *Powell v. Texas,* 492 U.S. 680, 685–86, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989) (per curiam); *Satterwhite v. Texas,* 486 U.S. 249, 254–55, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). A clear case would be an examination ostensibly limited to the defendant's competence to stand trial, but used to prove that the defendant was sane when he committed his crimes, without the lawyer's knowing it might be used in that way. If the lawyer knew, he might be able to limit the scope of the examination, or take other precautions to head off the possibility that damaging evidence would be created in the course of the examination.

This is not such a case. The prosecutor used Dr. Brown's report to rebut the testimony of a psychiatrist that Fleenor had committed the murder as the result of a transient psychotic episode brought on by emotional stress, the implication being that he wouldn't be a danger in the future if he were spared execution. Brown's report indicated that Fleenor's mental state was such as to create a continuing danger of lethal violence. This was proper rebuttal—unless the prognosis of dangerousness was so far outside the scope of Brown's original assignment that it may have blindsided Fleenor's lawyer.

While prognosis and diagnosis are conceptually distinct, the former often follows from the latter. If someone is diagnosed as having end-stage cancer, the prognosis of a likely early death follows. Similarly, a person diagnosed as having a permanent mental disorder can be expected to continue the pattern of behavior that led to that diagnosis. So Fleenor's lawyer would have known that Brown's determination of Fleenor's mental competence would have implications for the issue of Fleenor's future dangerousness, an issue bound to arise at the sentencing phase of a capital

case. In these circumstances, the use of this evidence did not circumvent the defendant's right to counsel. See, e.g., *Powell v. Texas, supra,* 492 U.S. at 685 and n. 3, 109 S.Ct. 3146; *Buchanan v. Kentucky,* 483 U.S. 402, 424–25, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987); *Savino v. Murray,* 82 F.3d 593, 603–05 (4th Cir.1996).

AFFIRMED.

RIPPLE, Circuit Judge, dissenting.

Because I believe that the Supreme Court's decision in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), requires reversal, I cannot join the majority's decision to affirm the judgment of the district court.

### 1.

The appropriate analytical starting point for an evaluation of this issue is to define with some precision the role that the jury plays in a capital case in Indiana. In its review of Mr. Fleenor's post-conviction petition, the Supreme Court of Indiana set forth that role in some detail. *See Fleenor v. State,* 622 N.E.2d 140, 143 (Ind.1993). That discussion warrants repeating here. The Court pointed out, as does the majority, that an Indiana jury is not charged with the responsibility of determining the sentence; it makes a recommendation as to whether the death penalty ought to be imposed. The state trial judge has the ultimate responsibility to determine whether to impose imprisonment or the death penalty. Nevertheless, under Indiana law the jury's recommendation is a very important part of the process of determining whether a person will live or die.

Although the formulations articulated by the Supreme Court of Indiana have evolved over the years, it is fair to say that Indiana law constrains significantly the options of both the trial court and the Supreme Court in the face of a jury recommendation against death. The responsibilities of the trial court are summarized

in *Roark v. State,* 644 N.E.2d 565 (Ind. 1994):

When the trial court has a jury recommendation against death before it, the single essential feature of this part of the sentencing process is that at the point of final decision the court reflect upon the jury recommendation against imposing death. A judge who proceeds in this manner will have satisfied the requirement of due consideration of such jury recommendation. In cases where the jury recommends against death, this consideration reflects appreciation that the jury's recommendation is a statement by the "conscience of the community" that each and every member of a jury that unanimously found the defendant guilty of murder has reconciled himself or herself to returning to the homes and workplaces of the community where in all likelihood the murder occurred, having unanimously recommended against a sentence of death in the face of the State's request for the death penalty. After such due consideration of the jury recommendation, the trial court must render its judgment.

*Id.* at 570 (footnote omitted).

The Supreme Court apparently is even more constrained in its evaluation of the jury's recommendation. In *Roark,* the Supreme Court of Indiana explained that its own review of a sentence of death involves a two-stage analysis:

(i) whether the trial court sentencing statement demonstrates due consideration of the jury recommendation; and (ii) whether this Court, upon independent reconsideration of a jury recommendation against death, nevertheless concludes that the death penalty is appropriate.

*Id.* at 571. In meeting its second responsibility, the Supreme Court apparently takes the approach set forth in *Peterson v. State,* 674 N.E.2d 528 (Ind.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 858, 139 L.Ed.2d 757 (1998).[1] It is clear, therefore,

---

1. In *Peterson,* the court stated that "[a]s part of our death penalty review we will indepen-

that both at the trial and the appellate levels, the recommendation of the jury against the infliction of the death penalty must be treated as a serious component in the sentencing decision. Notably, at the time that the Supreme Court of Indiana reviewed this case, it employed an even more stringent standard to the approval of a death sentence in the face of a jury recommendation that the defendant be allowed to live: "If the jury recommendation is against death, death is appropriate only if the facts justifying a death sentence are so clear and convincing that only death is reasonable." *Fleenor*, 622 N.E.2d at 143.

### 2.

*Caldwell* forbids leading a jury to believe that its role in the decision whether a person lives or dies will have less weight in the ultimate determination than state law actually gives that recommendation. *See Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994); *see also Johnston v. Singletary*, 162 F.3d 630, 642–43 (11th Cir.1998); *Duren v. Hopper*, 161 F.3d 655, 664 (11th Cir.1998); *Davis v. Singletary*, 119 F.3d 1471, 1481–85 (11th Cir.1997), *cert. denied*, —— U.S. ——, 119 S.Ct. 813, 142 L.Ed.2d 673 (1999); *Julius v. Johnson*, 840 F.2d 1533, 1544 (11th Cir. 1988). As the Supreme Court of Indiana recognized, and, indeed, as my colleagues seem to recognize as well, compliance with the holding of *Caldwell* is not a simple matter of finding "magic words" in a jury instruction; it requires an evaluation of the proceedings in their totality to determine whether the jury made its recommendation under a misapprehension as to the role that recommendation would play in the final determination of life or death.

Here, as the Supreme Court of Indiana recognized, matters got off on the wrong foot during the voir dire of the jury. In introducing the prospective jurors to their role, the state trial judge told them:

dently consider the jury recommendation against death and determine whether the death penalty is appropriate. However, we will not employ a standard that requires the

"[I]t's the Court's responsibility ultimately, you make a recommendation to the Court, the Court either follows it or doesn't, and then the Court ... can impose the death penalty, not impose the death penalty, and can give a sentence ... with a wide range of possibilities. You're not ... charged with that responsibility in this case.

Now your recommendation is just that. It's a recommendation it is not binding on the Court.... The Court may ignore it; the Court can accept it. In the final analysis the decision will be up to the Court."

*Fleenor*, 622 N.E.2d at 143.

As the Supreme Court of Indiana acknowledged, this formulation, as well as the variations occasionally employed by the trial judge, were "not entirely accurate." *Id.* at 143. "They do not inform the jury that the judge is required to give due consideration to the recommendation in deciding upon the sentence. Judges are ... not free to ignore the recommendation." *Id.* Examining the voir dire of counsel, the Supreme Court of Indiana also noted the contrast between the approach of the defense counsel and that of the prosecutor:

The voir dire questioning by defense counsel was generally very complete and accurate. It commonly took the following form:

"[I]t has been explained to you, the Jury does make a recommendation to the Court, recommending that the death penalty be imposed or recommending that the death penalty not be imposed. And that is certainly a factor that the Court would consider."

The voir dire by the trial prosecutor commonly took the following form:

"It would be up to the Judge to make the final determination, and your ac-

facts in the record to so clearly point to the imposition of the death penalty that the jury's recommendation is unreasonable." *Id.* at 540.

tion would simply be to recommend or not recommend death penalty.

[Y]ou make that recommendation to His Honor, ... he accepts that recommendation for consideration only. You understand that he is not bound by it. He listens to what you have to say, but he is the final judge.... His Honor, the Judge, imposes the penalty. You don't have to worry about that....

[T]he key word ... is recommendation.... [T]hat, maybe, takes some of the burden off of you....

[I]t is only a recommendation.... He listens to the evidence.... He also has a presentence report.... [H]e juggles all those things or whatever you want to say about it, and he makes that decision. So, I want to make it clear to you, you're not saying, as a Jury member, We impose the death penalty."

*Id.* at 143–44.

During his closing argument to the jury, the prosecutor returned to this theme of minimizing the role that the jury's recommendation would play in the ultimate decision of life or death for Mr. Fleenor. Indeed, his remarks did a great deal more than simply minimize the jury's role; it affirmatively misstated the law:

And there was a lot of talk about what if we make a mistake. I've thought about that. What if I'm wrong? You know. You've got to put a lot of people through a lot of—a lot of trouble, not to mention the defendant. What if I'm wrong? What if you're wrong? The Judge is going to consider your final recommendation, in this case. Or his rec—your recommendation. He's gonna make the final decision, Number One. Number Two, the law of this State requires—it's not optional—it requires that every death penalty decision is reviewed by the Supreme Court of this State. The Supreme Court of Indiana is gonna, automatically, review a death penalty case in this State. There's governors; there's Federal Judges; U.S. Supreme Court Justices and the U—U.S. Supreme Court, itself. You folks live in the real world and you know that that's—that's not—this is not the end of this case. The bird is not in your hands. You are asked to make a recommendation—a serious recommendation. It's not the end of this case. First of all, it's not a bird—it's not an innocent bird. And, secondly, it's not in your hands. You're only part of the system. I'm only part of it. You're only part of it. The Judge is only part of it. The Supreme Court—it's possible for human beings to make mistakes. Our law is a wise and reasonable law—they understand that. It doesn't say that uh—that the life of D.H. Fleenor is in your hands. It knows that even 12 wise people, in Johnson County, might make a mistake. It takes into—that into account and it says that not only the Jury, but the Judge who sits through the evidence, shall consider it. Maybe the Jury's wrong; maybe they missed something in the evidence; maybe they didn't apply this balancing of mitigating circumstances versus aggravating circumstances, correctly. And, then, we go to the Indiana Supreme Court—well, what if the Judge is wrong? Maybe he's made a mistake. We go to the Indiana Supreme Court and then beyond that there are—like I said, we live in a real world, we know there are many other recourses if somebody's made a mistake in this kind of a case. Is it really necessary? Is it really necessary? Well, I ask you: Is that the issue in this case? Has anyone said that that is the issue in this case? The bird is not in your hands, Ladies and Gentlemen. It's in the hands of—many of the branches of law enforcement in this—or, criminal justice in this State.

Tr. at 5072–75. Although the trial judge simply instructed the jury that its "recommendation is not binding upon the Court, it is a very valuable contribution," Tr. at

5090, the judicial and prosecutorial misstatements at voir dire and closing argument went otherwise uncorrected. When the record is evaluated as a whole, it is clear that the jury was made to "feel less responsible than it should for the sentencing decision." *Darden v. Wainwright*, 477 U.S. 168, 183 n. 15, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *see also Dugger v. Adams*, 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). The statements of the trial judge were in conflict; the statements of the prosecutor were wrong and, indeed, inflammatory.

Even under the standards employed today by the Supreme Court of Indiana, the information given the jury was simply wrong. It is worth noting, however, that the magnitude of the error is even more pronounced when one recalls that, at the time it reviewed this case, the Supreme Court of Indiana said, unequivocally, that the trial judge could not impose the death sentence unless "the facts justifying a death sentence are so clear and convincing that only death is reasonable." *Fleenor*, 622 N.E.2d at 143. The sentencing jury in this case was entitled to information accurate at the time it made the decision. *Cf. Romano v. Oklahoma*, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). The misleading remarks of the state trial judge and the prosecutor certainly prevented it from knowing that, had it recommended that the defendant be allowed to live, that recommendation would have constituted a high hurdle for the state to overcome before the state trial judge would have imposed the death penalty.

**3.**

The majority's tolerance of the state trial judge's lapse and the prosecutor's egregious conduct appears to be due in part to its own underestimation of the role that the jury's recommendation is to play in the sentencing process. It is simply not true, as a matter of Indiana law, that a jury's recommendation is weightless. *See supra* at 1100. The majority finds further comfort for its decision to overlook the prosecutor's having affirmatively misled the jury about its responsibility by suggesting that the prosecutor was not telling the jury anything that it did not already know. *See supra* at 1099–1100. The majority may well be correct in its belief that the average citizen called to jury duty believes the conventional wisdom that the decision made at the trial level is subject to many de novo reviews. If such a misconception exists, however, there is all the more reason to ensure that such disinformation is dispelled—not reinforced—before the jury gets down to the serious business of determining whether a man will live or die.

The majority finds yet another justification for overlooking the prosecutor's misstatement of the law by attempting to characterize, through selective examples, these misstatements as a permissible reply to improper argument on the part of the defense counsel. The proposition that misstatements of the law by a prosecutor are a permissible reaction to defense argument is a novel, and dangerous, justification—especially in the context of a death case. *See United States v. Johnson–Dix*, 54 F.3d 1295, 1305 (7th Cir.1995). Moreover, such a claim simply cannot be sustained on this record. A reading of the entire presentation of the defense makes two matters very evident: (1) defense counsel made it clear that the jury had to work within the legal framework of the State of Indiana, including the decision of the legislature that the death penalty ought to be imposed in some cases; and (2) counsel repeatedly told the jury that its task was to make a recommendation. With respect to the first point, the defense counsel straightforwardly told the jury that "you are here to punish murder and the only question is whether you have to recommend to kill D.H. Fleenor to do it." Tr. at 5003. My colleagues note emphatically defense counsel's stark description of capital punishment and his suggestion that it serves no purpose but retribution. The majority suggests that this was an unfair argument. But surely the defense has the

right to suggest to the jury that the punishment that the state asks it to recommend would, in the case before it, serve no other purpose. Notably, at no time did the defense counsel suggest that the jury ought not apply the law as explained by the judge. Indeed, the defense counsel reminded the panel of their obligation to follow the law:

> We're not here to debate whether or not there should be capital punishment. . . .

Tr. at 5013; *see also* Tr. at 5031.

With respect to the second point, it suffices to note that even the majority's selective quotation from defense counsel's argument makes clear that the defense counsel cast his remarks in terms of the jury's "responsibility for *recommending* to take the life of a fellow . . . human being." *See supra* at 1100 (quoting Tr. at 5010) (emphasis added).

This last justification offered by the majority for looking the other way in face of prosecutorial abuse—attacking the argument of the defense counsel—has ramifications well beyond this case and the fate of Mr. Fleenor. The majority's suggestion that the argument made by defense counsel is beyond the ethical pale will have a chilling effect on every attorney in this circuit who takes on the awesome responsibility of defending a person accused of a capital crime. It will stifle the capacity of the defense to touch the consciences of the jurors—citizens who have the right and the obligation to determine whether, under the law, the facts of the individual case require the imposition of the death penalty. Such a holding is a clear departure from the law established by the Supreme Court of the United States. *See Eddings v. Oklahoma,* 455 U.S. 104, 110–12, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

#### 4.

Because I believe that the result today is contrary to the holding of the Supreme Court of the United States in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), inconsistent with the holdings of the federal circuits that have interpreted that decision, and, in its treatment of defense counsel's argument, constitutes a clear departure from settled precedent, I would reverse the judgment of the district court. Accordingly, I respectfully dissent.

