STATE of Wisconsin, Plaintiff-Respondent,

v.

Joshua SLAGOSKI, Defendant-Appellant.†

Court of Appeals

No. 00–1586–CR. *Submitted on briefs February 9, 2001.—Decided April 4, 2001.*

## 2001 WI App 112

(Also reported in 629 N.W.2d 50.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Christopher W. Rose* of *Rose & Rose* of Kenosha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Gregory M. Posner-Weber,* assistant attorney general, and *James E. Doyle,* attorney general.

Before Brown, P.J., Nettesheim and Snyder, JJ.

¶ 1. BROWN, P.J. Joshua Slagoski appeals from a judgment of conviction and from a postconviction order denying his motion for sentence modification. He contends that the trial court sentenced him on the basis of materially inaccurate information, that the postconviction psychiatric evaluation by a forensic psychiatrist is a new factor warranting sentence modification, and that the use of pretrial competency and mental responsibility evaluations at sentencing violated Slagoski's Fifth and Sixth Amendment rights. We are satisfied that the trial court relied on accurate information in determining the sentence, and we hold that a postconviction, contradictory psychiatric opinion does not constitute a new factor for purposes of sentence modification. Finally, we hold that the trial court's consideration of pretrial psychiatric reports did not violate Slagoski's constitutional right to be free from compelled self-incrimination or his right to counsel.

¶ 2. In the early morning hours of April 22, 1999, eighteen-year-old Slagoski was discovered in the bedroom closet of N.M., his friend's mother. Slagoski was dressed in N.M.'s clothing, was armed with knives and razor blades, and was carrying handcuffs and duct tape.[1] He was charged with one count of burglary

---

[1] In a statement to police, Slagoski admitted entering N.M.'s bedroom on multiple occasions and confessed to having fantasies about "slashing the throats of [N.M.] and her boy-

under WIS. STAT. § 943.10(1)(a) (1999–2000)[2] and one count of burglary while armed with a dangerous weapon under § 943.10(2)(b).

¶ 3. In conjunction with Slagoski's pleas of not guilty and not guilty by reason of mental disease or defect, the trial court ordered competency and mental responsibility examinations. Dr. George Palermo, chosen by Slagoski, performed a mental responsibility examination of Slagoski on June 5, 1999. Dr. Frederick Fosdal performed a mental responsibility examination of Slagoski on June 8, 1999. Both psychiatrists believed Slagoski was legally sane at the time of the charged crimes. Additionally, Palermo believed that Slagoski posed a "homicidal-suicidal risk" because of his psycho-pathology. Both psychiatrists recommended psychotherapy.

¶ 4. Thereafter, Slagoski changed his pleas to guilty and no contest to single counts of burglary and armed burglary. During her sentencing argument, the prosecutor incorporated the findings of the two psychiatrists to establish Slagoski's future dangerousness. She then drew comparisons between Slagoski's behavior and certain behavioral traits observed by mental health professionals in some serial killers.[3]

friend and of killing them." He reported that he also had fantasies about "killing [N.M.] and skinning her and wearing her skin around and posing as her."

[2] All references to the Wisconsin Statutes are to the 1999–2000 version.

[3] The prosecutor buttressed her argument by referring to a journal article that attempts to predict which mentally disturbed adolescents may become serial killers. Bradley R. Johnson & Judith V. Becker, *Natural Born Killers: The Development of the Sexually Sadistic Serial Killer*, 25 J. AM. ACAD.

¶ 5. The trial court stated its belief that even if Slagoski shared certain characteristics with some serial killers, "that does not make him the reincarnation of Jeffrey Dahmer." The trial court believed that the reports of Palermo and Fosdal showed that Slagoski had certain mental health issues that increased his risk of future dangerousness. It sentenced Slagoski to a twenty-five year term of incarceration and a consecutive ten-year term of probation. Slagoski brings this appeal following the trial court's denial of his motion for sentence modification.

¶ 6. We first address Slagoski's contention that he was sentenced on the basis of inaccurate information. In support, he offers the affidavit of another psychiatrist, Dr. Basil Jackson, in which the doctor expresses his belief that the pretrial examinations provided an "inadequate foundation for coming to diagnostic and prognostic opinions" useful at sentencing. Jackson performed a postconviction examination of Slagoski to determine future dangerousness and concluded that he was not a sex offender, that he did not require sex offender treatment, that the crime Slagoski was involved in was not sexually motivated, that he did not fit the profile of a serial killer, and that he was not a danger to himself or others. In other words, Jackson's conclusions regarding Slagoski's future dangerousness completely contradict the report of Palermo that he could be a homicidal-suicidal risk.

¶ 7. Slagoski is correct that a defendant has a due process right "to be sentenced on the basis of true and correct information" pertaining to "the offense and the circumstances of its commission . . . and the defen-

PSYCHIATRY & LAW 335 (1997). This article, however, is not part of the appellate record.

dant's personality, social circumstances and general pattern of behavior." *State v. Perez*, 170 Wis. 2d 130, 138, 140, 487 N.W.2d 630 (Ct. App. 1992) (citations omitted). To establish a due process violation, a defendant must show by clear and convincing evidence not only that the trial court received inaccurate information, but also that the court relied on the inaccurate information in imposing sentence. *See State v. Johnson*, 158 Wis. 2d 458, 467 n.4, 468, 463 N.W.2d 352 (Ct. App. 1990). We also keep in mind that the focus of a competency exam is modest, seeking to verify the defendant's mental capacity to understand the proceedings and to assist counsel at the time of the proceedings. *See State ex rel. Haskins v. Dodge County Court*, 62 Wis. 2d 250, 265, 214 N.W.2d 575 (1974). In this instance, Slagoski argues that the competency evaluation suggesting a prognosis of a homicidal-suicidal risk is beyond its proper "understand and assist" scope, and therefore is materially inaccurate to a constitutional magnitude. *See United States v. Tucker*, 404 U.S. 443, 447 (1972) (sentencing decision was founded upon misinformation of a constitutional magnitude when it relied upon defendant's prior convictions which were later held unconstitutional).

¶ 8. We are not persuaded by this argument. Slagoski cites no cases in support of his theory that a competency or mental responsibility examination is inaccurate if it contains information regarding future dangerousness. Nor do we believe that it is outside the scope of such an examination to draw conclusions concerning the defendant's likelihood to engage in future dangerous acts. We find illuminating the comments of the Seventh Circuit in *Fleenor v. Anderson*, 171 F.3d 1096, 1101 (7th Cir. 1999):

> While prognosis and diagnosis are conceptually distinct, the former often follows from the latter. If someone is diagnosed as having end-stage cancer, the prognosis of a likely early death follows. Similarly, a person diagnosed as having a permanent mental disorder can be expected to continue the pattern of behavior that led to that diagnosis.

We will discuss *Fleenor* again when we consider Slagoski's Fifth and Sixth Amendment claims. For now we simply note that, in our view, *Fleenor* stands for the proposition that it is reasonable to anticipate that when a competency or NGI evaluation is conducted, the experts might render opinions regarding dangerousness. In fact, our review of clinical forensic literature adds support to this view. *See, e.g.,* P. Kirkish & S. Sreenivasan, *Neuropsychological Assessment of Competency to Stand Trial Evaluations: A Practical Conceptual Model*, 27 J. AM. ACAD. PSYCHIATRY & LAW 101, 102–03 (1999) (one prong for assessing competency is determination of prognosis for recovery and mechanism for facilitating that process).

¶ 9. We conclude that it is entirely reasonable that a mental competency examination designed to address a defendant's ability to understand the proceedings and assist counsel may also address issues of future dangerousness. If the evaluation establishes dangerousness, a court may reasonably consider it when gauging the need for public protection. This is wholly consistent with Wisconsin law which requires the sentencing court to consider all relevant available information pertaining to the seriousness of the offense, the character of the offender and the need for public protection. *See State v. Jones*, 151 Wis. 2d 488, 495, 444 N.W.2d 760 (Ct. App. 1989). In this case,

Palermo formed an impression after his interview with Slagoski that he might commit an act of murder or suicide in the future. This opinion was contained in the report which then became a part of the trial court record. The trial court, when fashioning an appropriate sentence, was entitled, indeed even required, to consider this information along with all other relevant evidence when evaluating the factors for sentencing. At the subsequent hearing on sentence modification, Slagoski offered a contradictory psychiatric opinion which he claimed rendered the prior opinions incorrect or inaccurate. However, the trial court was entitled to accept or disregard this information as it deemed appropriate. We are convinced that Slagoski has failed to prove, by clear and convincing evidence, that the trial court received inaccurate information and relied on it in imposing sentence.

¶ 10. Slagoski also contends that Jackson's post-conviction report is a new factor justifying sentence modification. Whether facts constitute a new factor is a question of law we review de novo. *State v. Michels*, 150 Wis. 2d 94, 97, 441 N.W.2d 278 (Ct. App. 1989). A new factor is a fact or set of facts highly relevant to the imposition of sentence, but not known to the trial court at the time of original sentencing, either because it was not then in existence or because it was unknowingly overlooked by the parties. *Rosado v. State*, 70 Wis. 2d 280, 288, 234 N.W.2d 69 (1975). The new factor not only must be previously unknown, but it must also strike at the very purpose of the original sentence. *Michels*, 150 Wis. 2d at 99.

¶ 11. We do not agree that the existence of a contradictory psychiatric report establishes a new factor

requiring sentence modification. To the extent Jackson's conclusions contradict other reports in the record, we find this simply establishes that mental health professionals will sometimes disagree on matters of diagnosis and treatment. Moreover, as the State has pointed out, determinations similar to Jackson's were part of the record as contained in a social worker's letter to the court.[4] We conclude therefore that Jackson's postconviction psychiatric report is not a new factor justifying sentence modification.

¶ 12. We now consider Slagoski's contention that use of the pretrial psychiatric evaluations during sentencing violated his Fifth Amendment right to be free from compelled self-incrimination and his Sixth Amendment right to the assistance of counsel. Relying primarily on *Estelle v. Smith*, 451 U.S. 454 (1981), Slagoski argues his constitutional rights were violated when, before the pretrial examinations, he was not advised that he had the right to remain silent and that his statements and the reports themselves could later be used against him during the sentencing proceedings. We find no such violations.

¶ 13. In *Estelle*, the Supreme Court held that the privilege against self-incrimination applies to court-ordered pretrial psychiatric examinations, stating that: "A criminal defendant, who neither initiates a

---

[4] Jackson concluded that "Joshua is an emotionally disturbed young man whose psychopathology is directly associated with the idea of abandonment." His commission of the crime was the result of his preoccupation "with union and fusion with [N.M.] which would prohibit her, i.e., as a surrogate, mother from ever abandoning him again." The social worker characterized his behavior as "a psychotic manifestation of his emotional need to merge with his birth mother and his earlier *unspeakable* reaction to his early life abandonment by her."

psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.* at 468. Any statements made by a defendant during such an examination can only be used if the defendant has been advised of his or her *Miranda*[5] rights and knowingly waives them. *Estelle*, 451 U.S. at 469. The Court further held that the defendant has a Sixth Amendment right to counsel regarding the decision of whether to cooperate, which requires that the attorney receive notice of the scope, nature and intended uses of the evaluation. *Id.* at 470–71. Both amendments thus require clear notice to the defendant and counsel regarding any psychiatric evaluation by the prosecution. *Id.* at 471.

¶ 14.　The Supreme Court has since limited its holdings in *Estelle* to the distinct facts of the case. In *Buchanan v. Kentucky*, 483 U.S. 402 (1987), the Court found no Fifth or Sixth Amendment violation because defense counsel had joined in the State's motion for the psychiatric examination and the defendant had asserted a mental status defense. *Id.* at 424–25. After *Buchanan*, a defendant who initiates a psychiatric evaluation and places mental status in controversy waives the right to remain silent, but not the right to notice. *See Powell v. Texas*, 492 U.S. 680, 685 (1989); *Savino v. Murray*, 82 F.3d 593, 604 (4th Cir. 1996); *see also State v. Worthington*, 8 S.W.3d 83, 91–92 (Mo. 1999) (concluding that *Estelle* does not bar use of psychiatric reports where defendant requests mental status evaluation and asserts mental status defense).

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 15. It is clear that Slagoski waived his Fifth Amendment rights when, through counsel, he initiated a psychiatric evaluation and placed his mental condition into controversy by entering pleas of not guilty and not guilty by reason of mental disease or defect. Furthermore, his own attorney requested Palermo for the psychiatric evaluation. Because Slagoski commenced the process for the pretrial evaluations and submitted to the examinations, he cannot now claim that its use in sentencing compelled him to testify against himself.

¶ 16. The main thrust of Slagoski's argument is that he deserved specific notice that his evaluations could be used to establish future dangerousness at sentencing. We are in agreement with the line of cases that hold no such specific notice is required under *Estelle* and its progeny. *See Savino*, 82 F.3d at 604–05; *Fleenor*, 171 F.3d at 1101–02. In *Savino*, the Fourth Circuit held that there is no Fifth or Sixth Amendment violation where defense counsel had actual notice of the pretrial examinations. *Savino*, 82 F.3d at 605. When defense counsel is fully aware of the examinations, the Constitution does not require specific notification that a psychiatric evaluation might provide a basis for a future dangerousness argument. *Id.*; *see also Woomer v. Aiken*, 856 F.2d 677, 682 (4th Cir. 1988) (noting that defense counsel should be aware that requested psychiatric evaluations might generate unfavorable results and concluding "[i]t is of little moment that counsel was not specifically advised that the evaluation might provide a basis for addressing the issue of [the defendant's] future dangerousness since [the doctor's] opinion on that issue was predicated on

the same information that was necessarily gathered to evaluate [the defendant's] sanity.").

¶ 17. Finally, the recent decision of the Seventh Circuit in *Fleenor* is also persuasive on the issue. In *Fleenor*, the defendant challenged the prosecutor's use—in rebuttal at sentencing—of a report generated by a psychiatrist who examined the defendant to determine his sanity at the time of trial. *Fleenor*, 171 F.3d at 1101. The court construed *Estelle* as standing for the proposition that "it is . . . unconstitutional [under the Sixth Amendment] to put into evidence the result of a pretrial psychiatric examination the *scope* of which the lawyer was unaware of." *Fleenor*, 171 F.3d at 1101. The court reasoned, however, that defense counsel was on constructive notice of what a sanity examination might reveal:

> [Fleenor's] lawyer would have known that [the psychiatrist's] determination of Fleenor's mental competence would have implications for the issue of Fleenor's future dangerousness, an issue bound to arise at the sentencing phase of a capital case. In these circumstances, the use of this evidence did not circumvent the defendant's right to counsel.

*Id.* at 1101–02.

¶ 18. We apply this reasoning to the instant case. We inquire whether the prognosis of dangerousness (a homicidal-suicidal risk) was so far outside the scope of Palermo's original evaluation that it may have blindsided Slagoski's attorney at the sentencing hearing.[6]

---

[6] The record includes an affidavit by the attorney who represented Slagoski at the original sentencing hearing. In it, he states that he had no notice that the examination would include issues other than competence. Nor did he have notice that such

From the record, it is clear that Slagoski's attorney was well aware of his client's mental and behavioral issues as revealed by his comments when he chose to have Palermo conduct the pretrial evaluation: "You know [Palermo] was involved in the Dahmer case, and I don't think any doctor is more equipped [than] him to deal with that kind of atrocious behavior pattern." We have no doubt that here, as in *Fleenor*, the defense was reasonably put on notice that the clinical impressions of both doctors would be highly relevant to the issue of future dangerousness, a legitimate sentencing consideration. For this reason, we hold the use of the pretrial psychiatric reports at the sentencing proceeding did not violate Slagoski's right to counsel.

¶ 19. Given the facts that Slagoski's original pleas put his mental competency at issue and that Slagoski's attorney consented to the two mental competency examinations and had actual notice of them, we hold that the use of those reports during sentencing did not violate his right against self-incrimination. Because the prognosis of future dangerousness was within the scope of the competency examination, no Sixth Amendment violation occurred. The original sentence was not based on materially inaccurate information and Jackson's report was not a new factor requiring sentence modification.

*By the Court.*—Judgment and order affirmed.

information would be used at the sentencing proceeding. The attorney then states that had he known these facts, he would have advised Slagoski to assert his Fifth Amendment privilege.