COURT OF APPEALS
DECISION
DATED AND FILED

November 8, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1442-CR**

Cir. Ct. No. **2019CF860**

STATE OF WISCONSIN

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

  V.

CALEY M. JONES,

  DEFENDANT-APPELLANT.

  APPEAL from a judgment and an order of the circuit court for Milwaukee County: JOSEPH R. WALL and GLENN H. YAMAHIRO, Judges. *Affirmed*.

  Before Brash, C.J., Dugan and White, JJ.

  **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Caley M. Jones appeals his judgment of conviction for second-degree sexual assault of a child, as well as an order denying his postconviction motion. Jones argues that the trial court erred in denying his motion to suppress the statement he made to a police detective on the grounds that his constitutional rights against self-incrimination were not properly waived, and that his statement was coerced. He also reasserts the request in his postconviction motion for sentence modification based on the existence of an alleged new factor.

¶2 Upon review, we reject Jones's arguments and affirm.

## BACKGROUND

¶3 The charge against Jones stemmed from an incident in October 2018, when Jones was babysitting for his six-year-old relative, O.M.T., at O.M.T.'s residence in Milwaukee. O.M.T. disclosed to police during a forensic interview conducted in February 2019 that Jones had made O.M.T. put his mouth on Jones's penis two different times while Jones was babysitting him.

¶4 Jones was arrested and charged with two counts of first-degree sexual assault of a child. Two custodial interviews were conducted after his arrest. The first interview took place around midnight on February 25, 2019, a few hours after Jones was arrested. During that interview, Jones was advised of his *Miranda*[1] rights, which he indicated that he understood. Jones then waived those rights and made a statement in which he denied doing "anything sexual" with O.M.T.

¶5 After that interview, Jones was taken to the hospital where he received prescription medication for ADHD. Jones was subsequently interviewed again at

---

[1] *See **Miranda v. Arizona**, 384 U.S. 436 (1966).

2

approximately 10:00 a.m. on February 26, 2019.  Jones was again advised of his *Miranda* rights.  During that interview, Jones admitted that his penis was exposed while he was babysitting O.M.T., and that O.M.T. "lick[ed]" his penis "one time."

¶6      Jones filed a motion to suppress the statement he made in the second interview.  He asserted that his waiver of his rights was not knowing, voluntary, and intelligent, because the detective read through the *Miranda* warnings very quickly, and because his ADHD and his medication for that condition had diminished his ability to understand his rights.  Jones also argued that his statement was coerced by the detective conducting the interview due to the manner in which the detective questioned Jones, and the "intense psychological pressures" that he put on Jones.

¶7      A hearing on the motion was held in September 2019.  The trial court[2] noted that it had reviewed recordings of the interviews, and acknowledged that the *Miranda* warnings were read "fast" during the second interview.  However, the court observed that the detective had made reference to Jones being advised of his rights during the first interview; specifically, the detective stated, "Before I talk to you though, I notice they read to you your rights yesterday.  Anybody who's in custody, they have to have their rights read to them.  You understand that; right?  So I'm going to do that again."  The trial court further stated that Jones had ultimately indicated that he understood his rights and was willing to make a statement.

¶8      The trial court further found that the tactics used during the questioning of Jones, such as minimizing the seriousness of the offense to encourage a confession, are "common tool[s]" utilized by the police during interrogations, and

[2] The Honorable Stephanie Rothstein heard and decided Jones's motion to suppress; we refer to her as the trial court.  Additionally, we refer to the Honorable Joseph R. Wall, who accepted Jones's plea and imposed his sentence, as the sentencing court, and the Honorable Glenn H. Yamahiro, who decided Jones's postconviction motion, as the postconviction court.

that the interview was not unduly lengthy or overly confrontational. Additionally, the court found that Jones did not show signs of being under physical or mental duress, nor did he demonstrate any cognitive or intellectual limitations. The court also determined that a report by a psychologist relating to Jones's ADHD medication was speculative and did not establish that it had affected Jones's ability to understand the questions posed by the detective.

¶9  Therefore, the trial court found that there was no ***Miranda*** violation and denied Jones's motion to suppress. Jones then entered into a plea agreement, in February 2020, under which he pled no contest to one count of second-degree sexual assault of a child. He was sentenced in September 2020 to five years of initial confinement to be followed by five years of extended supervision. The conviction also required Jones to register as a sex offender.

¶10  Jones subsequently filed a postconviction motion seeking sentence modification. He argued that there was a new factor that warranted modification; that is, a postconviction psychological evaluation relating to Jones's likelihood of sexual recidivism and treatment needs. Jones asserted that the sentencing court had expressed concern at sentencing over Jones's failure to take responsibility, and contended that the psychological evaluation explained that this failure is not indicative of an increased likelihood of recidivism.

¶11  The postconviction court rejected Jones's arguments. It found that the conclusion in the postconviction psychological evaluation regarding Jones's low risk of recidivism was not highly relevant to the sentence imposed by the sentencing court because Jones's "overall good character and his low risk of recidivism were not in question" at sentencing. Thus, postconviction court found that Jones had not established that the evaluation was a new factor.

¶12    Furthermore, the postconviction court stated that even if the evaluation was a new factor, sentence modification was not warranted.  The postconviction court observed that Jones had obtained an "enormous benefit" through the plea negotiations in terms of limiting his prison exposure.  The postconviction court also noted that the sentencing court had made it "exceedingly clear" that the sentence it imposed "was primarily motivated by the gravity of the offense."  Therefore, the postconviction court denied Jones's motion.  This appeal follows.

## DISCUSSION

*Motion to Suppress*

¶13    We first discuss Jones's argument that the trial court erred in denying his motion to suppress his statement to police.  The review of a trial court's decision on a motion to suppress presents a mixed question of fact and law.  ***State v. Eason***, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625.  We will not reverse the trial court's findings of fact unless they are clearly erroneous; however, we review *de novo* the application of constitutional principles to those facts.  ***Id.***

¶14    "In order to be valid, a ***Miranda*** waiver must be knowing, voluntary and intelligent."  ***State v. Ward***, 2009 WI 60, ¶30, 318 Wis. 2d 301, 767 N.W.2d 236.  Such a waiver is deemed to be knowing, voluntary, and intelligent if it is "'the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and has 'been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  ***Id.*** (citation omitted).  The burden is on the State to establish a prima facie case that these requirements were met.  ***State v. Lee***, 175 Wis. 2d 348, 359, 499 N.W.2d 250 (Ct. App. 1993).  If that burden is met, the statements are admissible unless the defendant

5

presents "countervailing evidence" demonstrating that the waiver was not valid or that the statement was not voluntary. *Id.*

¶15 Jones argues that neither of these requirements were met during his second custodial interview. Jones first asserts that the *Miranda* rights provided in the second interview were read by the detective very quickly and without regard to whether Jones understood them, and further, that the trial court's reliance on the *Miranda* rights given in the first interview as providing adequate notice was in error.

¶16 In support of his argument, Jones suggests that the trial court's characterization of the first interview as "very nonconfrontational" distinguishes it from the second interview, and thus he asserts that the *Miranda* rights given during the first interview should not be considered in the analysis regarding the validity of the rights given in the second interview. Jones cites to *State v. Hambly*, 2008 WI 10, 307 Wis. 2d 98, 745 N.W.2d 48, for the premise that "[t]he procedural safeguards set forth in *Miranda*'s protection of Fifth Amendment rights 'are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.'" *Id.*, ¶22 (citation omitted).

¶17 However, regardless of the manner in which the first interview was conducted, Jones had been arrested and was in custody at that time, and there were questions presented to him that related to "his association with the alleged victim and the alleged victim's family and what was going on on the premises where he's accused of having committed this crime on the day in question." The first interview was therefore a custodial interrogation, and was recognized as such by the trial court in its decision.

¶18 Moreover, although the trial court recognized that the *Miranda* rights were read through very quickly in the second interview, the court also observed that

6

there had been a "lengthy discussion" with Jones during the first interview regarding his rights, and that the detective in the second interview referenced that discussion. Jones asserts that the approximate ten-hour time span between the first and second interviews makes the *Miranda* rights given in the first interview too far removed to bolster any deficiencies of the rights provided in the second interview. Jones again cites to *Hambly* for support; however, the issue in *Hambly* was whether the defendant, in requesting counsel before his *Miranda* rights were given and questioning had begun, had effectively invoked his Fifth Amendment rights. *Hambly*, 307 Wis. 2d 98, ¶¶16-17. We thus do not find *Hambly* particularly instructive in this context. Rather, we observe that the record clearly demonstrates that the detective read through the *Miranda* rights during the second interview, after making reference to them having been discussed in the first interview, and that Jones ultimately indicated that he understood his rights and was willing to waive them and make a statement, which complied with the requirements of *Miranda*. *See Lee*, 175 Wis. 2d at 359.

¶19    Jones also argues that his ADHD and the medication for that condition which he was given at the hospital after being arrested affected his ability to understand his *Miranda* rights and the consequences of waiving them, as well as making him more susceptible to coercive tactics during questioning. In support of this argument, Jones submitted with his suppression motion a report from Dr. Lawrence T. White, a psychology professor at Beloit College. Dr. White opined that "[i]f Jones was symptomatic for ADHD, experiencing drug side effects, or fatigued at the time of the interrogation, he likely experienced a deficit in executive functioning," and that such a deficit "increase[s] the likelihood that a suspect will (a) comply to an interrogator's implicit and explicit requests and (b) show poor judgment about the likely consequences of his actions." Dr. White further stated

7

that the interrogation tactics used on Jones during the second interview could have led to a false confession, rendering Jones's statement during that interview unreliable.

¶20 In other words, Jones contends that his statement in the second interview was coerced. When determining whether a defendant's statement was "coerced or the product of improper pressures exercised by the person or persons conducting the interrogation," we apply a totality of the circumstances test. *State v. Hoppe*, 2003 WI 43, ¶¶37-38, 261 Wis. 2d 294, 661 N.W.2d 407. "The totality of the circumstances analysis involves a balancing of the personal characteristics of the defendant against the pressures imposed upon the defendant by law enforcement officers." *Id.*, ¶38.[3] Such personal characteristics include "the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement." *Id.*, ¶39. These personal characteristics are then balanced against the tactics used by the police during the interrogation, such as the length of the questioning, any "excessive physical or psychological pressure brought to bear" on the defendant, any "inducements, threats, methods or strategies used by the police to compel a response," and whether the defendant was provided the *Miranda* rights regarding the right to counsel and the right against self-incrimination. *Hoppe*, 261 Wis. 2d 294, ¶39.

¶21 This balancing of personal characteristics against police tactics reflects a recognition that "the amount of police pressure that is constitutional is not

---

[3] We recognize that the balancing test is not required if an analysis of the facts in the record does not indicate that improper or coercive tactics were utilized by police. *See State v. Vice*, 2021 WI 63, ¶31, 397 Wis. 2d 682, 961 N.W.2d 1. However, based on the nature of Jones's claim—that his ADHD or his medication for that condition made him particularly susceptible to any potentially coercive tactics used by the detective in the second interview—we analyze this issue by employing the balancing test, even though we ultimately conclude that there were no improper or coercive tactics used by the detective.

the same for each defendant." *Id.*, ¶40. Indeed, when the allegedly coercive tactics include "subtle forms of psychological persuasion, the mental condition of the defendant becomes a more significant factor in the 'voluntariness' calculus." *Id.* Conversely, "[t]he more sophisticated and less vulnerable the suspect is, the more likely it becomes that his or her statements were voluntary." *Ward*, 318 Wis. 2d 301, ¶19.

¶22 In reviewing Dr. White's report regarding the possible effects of Jones's ADHD and medication during the second interview, we conclude that Dr. White's opinions do not correlate with events as set forth in the record. The detective who conducted the second interview asked Jones about his being provided medication for his ADHD at the hospital after his first interview the night before; Jones explained that the medication caused him to be "not as focused" at times, but confirmed that he was "all right" at the time of the interview.

¶23 Additionally, the detective testified at the suppression hearing that he believed Jones understood his *Miranda* rights. The detective explained that when he reads *Miranda* rights to suspects, he observes them to see if they are "puzzled" during the recitation, he confirms that they understand those rights, and he answers any questions they may have. The detective stated that he observed nothing that would indicate that Jones did not understand his rights.

¶24 Furthermore, Jones was alert and responsive to questions during the interview and showed no signs of cognitive or intellectual limitations. Moreover, he displayed a calm demeanor and did not appear to be sleepy or fatigued. In short, there was no indication that Jones's ADHD or his medication affected his ability to understand and respond to the detective's questions during the second interview.

¶25    Turning to the tactics utilized during the second interview, the detective, in his testimony at the suppression hearing, admitted to using "minimization," stating that he uses it "often."  This is a tactic that "courts commonly accept." *State v. Moore*, 2015 WI 54, ¶64, 363 Wis. 2d 376, 864 N.W.2d 827.  Although it may have influenced Jones, we find no support in the record for Jones's contention that this form of persuasion caused excessive psychological pressure on him that would render his statement involuntary, given that there is no indication that his ADHD and the medication he took for it were detrimentally affecting him during the second interview.  *See Hoppe*, 261 Wis. 2d 294, ¶40.

¶26    Additionally, Dr. White stated in his report that Jones had been subjected to isolation prior to the second interview.  In that statement, Dr. White suggests that Jones likely felt isolated due to a lack of emotional support from his family and friends.  However, being separated from family and friends is generally a component of spending the night in jail.  Furthermore, as the trial court noted, because Jones was taken to the hospital after his arrest to obtain medication for his ADHD, he necessarily would have been accompanied there by an officer and would have interacted with medical personnel.  Thus, there is no evidence that Jones was isolated between the first and second interviews.

¶27    Furthermore, in analyzing the totality of the circumstances, we also consider other factors with regard to the second interview.  *See id.*, ¶39.  As to the personal characteristics of Jones in addition to his ADHD, he was thirty-five years old at the time he was arrested, he was educated and, according to Dr. White, "appear[ed] to possess normal intelligence."  The interview itself only lasted approximately forty-five minutes, which is not overly lengthy.  Moreover, the interview was not confrontational; there were no threats made by the detective, nor was he derogatory towards Jones in terms of "assail[ing] his character."  Therefore,

based on the totality of all of these circumstances, we conclude that Jones was not coerced into making his statement to the detective during the second interview. *See id.*, ¶¶37-39.

¶28 In short, the record demonstrates that Jones's statement was knowing, voluntary, and intelligent, and Jones has not presented countervailing evidence that convinces us otherwise. *See Lee*, 175 Wis. 2d at 359. Therefore, the trial court did not err in denying his motion to suppress. *See id.*

*Sentence Modification*

¶29 Jones also seeks sentence modification based on a new factor, specifically, a report by a psychologist, Dr. Anthony Jurek, addressing Jones's risk of sexual recidivism and treatment needs, which Jones submitted with his postconviction motion.

¶30 A motion for sentence modification may be granted "upon a showing of a new factor." *State v. Hegwood*, 113 Wis. 2d 544, 546, 335 N.W.2d 399 (1983). A "new factor" is defined as:

> [A] fact or set of facts highly relevant to the imposition of sentence, but not known to the trial judge at the time of original sentencing, either because it was not then in existence or because, even though it was then in existence, it was unknowingly overlooked by all of the parties.

*Rosado v. State*, 70 Wis. 2d 280, 288, 234 N.W.2d 69 (1975).

¶31 The defendant bears the burden of proving "by clear and convincing evidence the existence of a new factor." *State v. Harbor*, 2011 WI 28, ¶36, 333 Wis. 2d 53, 797 N.W.2d 828. Whether the defendant has established the existence of a new factor is a question of law that we review *de novo*. *See Hegwood*, 113 Wis.

11

2d at 547. Furthermore, even if a new factor is found to be present, the trial court then exercises its discretion to determine whether that new factor warrants sentence modification. *Harbor*, 333 Wis. 2d 53, ¶37. We review that decision for an erroneous exercise of discretion. *Id.*, ¶33.

¶32 Dr. Jurek's interview with Jones was conducted in May 2021, and his corresponding report was prepared in June 2021; both occurred after Jones was sentenced in September 2020. Thus, there is no question that this information was not available at the time of sentencing. *See Rosado*, 70 Wis. 2d at 288. The issue, then, is whether the information in Dr. Jurek's report is "highly relevant" as it relates to the sentence that was imposed. *See id.*

¶33 Jones specifically emphasizes Dr. Jurek's statement that

> [w]hether an individual admits to, or takes responsibility for their sexual misconduct, has never been identified as a reliable indicator of their risk for future sexual misconduct. In fact, some research inquiries have found that denial of guilt or responsibility can be associated with lower risk of sexual recidivism …. This is particularly true for … first-time offenders who are not at elevated risk of sexual recidivism, and may reflect that fact that they find that they are unable to accept their own actions relevant to an alleged offense because they are at odds with their own perception of themselves.

¶34 Dr. Jurek's evaluation was the second such psychological evaluation of Jones in this case. Previously, in October 2019, prior to sentencing, Dr. Charles M. Lodl conducted an evaluation of Jones at the request of his trial counsel. Dr. Lodl's report was referenced by the sentencing court during the sentencing hearing. In particular, the sentencing court noted that the testing Dr. Lodl performed on Jones indicated a "very low percentage likelihood of re-offending."

¶35 This court has previously observed that conflicts in psychological evaluations do not necessarily establish a new factor, but rather "simply establishes that mental health professionals will sometimes disagree on matters of diagnosis and treatment." *State v. Slagoski*, 2001 WI App 112, ¶11, 244 Wis. 2d 49, 629 N.W.2d 50. Furthermore, the opinions of the psychologists here do not directly conflict in their ultimate conclusions. As Dr. Jurek recognized in his report, although there was a "discrepancy" between his opinion and that of Dr. Lodl with regard to the risk estimate for recidivism, both he and Dr. Lodl agreed that "meaningful containment of any risk of sexual recidivism" by Jones could be accomplished in a community-based setting, as opposed to prison.

¶36 In that vein, Jones argues that Dr. Jurek's report was not highly relevant to the recidivism risk assessment considered by the sentencing court, but rather is highly relevant with regard to the sentencing court's assessment of Jones's character. In particular, Jones cites to the sentencing court's focus on Jones's failure to take responsibility for his crime. To that end, Jones frames his argument as a due process claim that the sentencing court relied on inaccurate information in imposing sentence. *See State v. Tiepelman*, 2006 WI 66, ¶9, 291 Wis. 2d 179, 717 N.W.2d 1.

¶37 However, the remedy for this type of claim is resentencing, as opposed to sentence modification. *See id.*, ¶26; *see also State v. Wood*, 2007 WI App 190, ¶9, 305 Wis. 2d 133, 738 N.W.2d 81 (explaining that although sometimes they have been used interchangeably, the terms "sentence modification" and "resentencing" are actually "distinctly different concepts," in that sentence modification seeks to "correct specific problems" of a sentence, while resentencing is necessary when the original sentence is deemed to be invalid). Here, Jones has

specifically requested sentence modification—based on his assertion that Dr. Jurek's report is a new factor—not resentencing.

¶38 Moreover, Jones has not demonstrated that any information relating to his character that was relied upon by the sentencing court was inaccurate, as required to establish a due process claim. *See **Tiepelman***, 291 Wis. 2d 179, ¶26. Rather, he suggests that Dr. Jurek's report offers an explanation that would offset the aggravating factor of his failure to accept responsibility for his crime. In doing so, Jones conflates the standards for sentence modification and resentencing.

¶39 We decline to use that conflated approach. Instead, we analyze this issue as directed in ***Harbor***—that "if the [postconviction] court determines that in the exercise of its discretion, the alleged new factor would not justify sentence modification, the court need not determine whether the facts asserted by the defendant constitute a new factor as a matter of law." ***Id.***, 333 Wis. 2d 53, ¶38. In other words, our framework for the review of this issue is whether the postconviction court, in assuming *arguendo* that Dr. Jurek's report constituted a new factor, properly exercised its discretion in determining that sentence modification was nevertheless not warranted. *See **id.***, ¶37. This analysis, in effect, considers whether the original purpose of the sentence was frustrated in light of the purported

new factor of Dr. Jurek's report, which seems to be what Jones is intimating in his argument.[4] *See id.*, ¶50.

¶40    We conclude that the postconviction court properly considered this issue. As the postconviction court pointed out, it was "exceedingly clear" that the sentencing court gave great weight to the gravity of the offense. In fact, the sentencing court directly stated that "[t]he gravity of the offense if it isn't obvious by now is the main sentencing factor of the three, just the terrible seriousness of this crime." That is, the fact that Jones forced his six-year-old relative to "put his mouth on [Jones's] penis, twice."

¶41    In other words, while the sentencing court did consider Jones's "otherwise good character" and the fact that he "presented a low recidivism risk, had negligible rehabilitative needs, and that there was a minimal need to protect the public from him (i.e., specific deterrence)," the sentence it imposed was "explicitly motivated" by the seriousness of Jones's criminal conduct. The postconviction

---

[4] We note that Jones relies on *State v. Norton*, 2001 WI App 245, ¶9, 248 Wis. 2d 162, 635 N.W.2d 656, for the premise that "a new factor is 'an event or development which frustrates the purpose of the original sentence,'" which quoted *State v. Michels*, 150 Wis. 2d 94, 99, 441 N.W.2d 278 (Ct. App. 1989). However, *Michels* was abrogated by *State v. Harbor*, 2011 WI 28, ¶52, 333 Wis. 2d 53, 797 N.W.2d 828, wherein our supreme court rejected the language set forth in *Michels* suggesting that an alleged new factor "must also frustrate the purpose of the original sentence" as an additional requirement for establishing a new factor. *Harbor*, 333 Wis. 2d 53, ¶52. Furthermore, this court, in a recent unpublished decision, observed that "frustration of the purpose of the original sentence is only to be considered if a defendant first meets its burden of a showing of a new factor." *State v. Christel*, Nos. 2020AP1127-CR and 2020AP1128-CR, unpublished slip op. ¶57 (WI App Dec. 8, 2021). That directs us to the framework for our analysis: that even if Dr. Jurek's report is presumed to be a new factor, we must then consider whether the postconviction court properly exercised its discretion in determining that sentence modification was still not warranted. *See Harbor*, 333 Wis. 2d 53, ¶37; *see also* WIS. STAT. RULE 809.23(3)(b) (2019-20) (a judge-authored unpublished opinion issued on or after July 1, 2009, may be cited for its persuasive value). It is in this context that the sentencing court's purpose and reasoning for Jones's original sentence is considered.

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

court also pointed out that Jones's prison exposure was greatly reduced as a result of the plea agreement he entered into, which amended the charges from two counts of first-degree sexual assault of a child to one count of second-degree sexual assault of a child, eliminating the requirement for a mandatory minimum term of initial confinement of twenty-five years. *See* WIS. STAT. § 939.616(1r).

¶42 Therefore, the postconviction court determined that sentence modification was not warranted. Based on the facts in the record and the relevant case law, this was an appropriate exercise of its discretion. *See **State v. Sulla***, 2016 WI 46, ¶23, 369 Wis. 2d 225, 880 N.W.2d 659 (a postconviction court has properly exercised its discretion "'when it has examined the relevant facts, applied the proper legal standards, and engaged in a rational decision-making process'" (citation omitted)).

¶43 In sum, we conclude that no errors were committed in the denial of Jones's motion to suppress his statement to police in his second interview, or in the denial of his postconviction motion seeking sentence modification. We therefore affirm his judgment of conviction and the order denying his postconviction motion.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.